necessary for all 10,000 square miles in Unit 12 was clearly erroneous and must be reconsidered.

    **B.    The regulations are inconsistent with the regulatory definition of customary and traditional use and with application of the regulatory criteria for finding customary and traditional use.**

Reconsideration is required because, in adopting the customary and traditional use determination, the Board failed to follow the regulatory definition of customary and traditional use and the regulatory criteria for finding customary and traditional use.

The regulatory definition of "customary and traditional use," is: "[A] long-established, consistent pattern of use, incorporating beliefs and customs which have been transmitted from generation to generation. This use plays an important role in the economy of the community." 36 CFR § 242.4; 50 CFR § 100.4.

The regulations require the Board to determine which fish stocks and wildlife populations have been customarily and traditionally used for subsistence and to identify the specific community's or area's use of specific fish stocks and wildlife populations. 36 CFR § 242.16(a); 50 CFR § 100.16(a). Eight specific factors which must be generally exhibited are established for finding customary and traditional use:

    (1) A long-term consistent pattern of use, excluding interruptions beyond the control of the community or area;
    (2) A pattern of use recurring in specific seasons for many years;
    (3) A pattern of use consisting of methods and means of harvest which are characterized by efficiency and economy of effort and cost, conditioned by local characteristics;
    (4) The consistent harvest and use of fish or wildlife as related to past methods and means of taking; near, or reasonably accessible from, the community or area;
    (5) A means of handling, preparing, preserving, and storing fish or wildlife which has been traditionally used by past generations, including consideration of alteration of past practices due to recent technological advances, where appropriate;
    (6) A pattern of use which includes the handing down of knowledge of fishing and hunting skills, values, and lore from generation to generation;
    (7) A pattern of use in which the harvest is shared or distributed within a definable community of persons; and
    (8) A pattern of use which relates to reliance upon a wide diversity of fish and wildlife resources of the area and which provides substantial

cultural, economic, social, and nutritional elements to the community or area.

36 CFR § 242.16(b); 50 CFR § 100.16(b).

The eight factors were not discussed by the Board members, *see* Transcript Volume I, at 121-141 (May 3, 2005) ("Transcript"); and the written staff analysis, focused on general subsistence use issues without showing use in all of Unit 12. *See* Materials 191-194. The only factor explicitly discussed before the Board was factor 4, Transcript at 129, and that discussion did not support the Board's determination:

> Under factors for determining customary and traditional uses, Factor 4, which begins on Page 192, addresses their consistent harvest for the area. The available household harvest data for Chistochina residents from 1991 to 2002 shows the harvest of moose in the portion labeled (A) of Unit 12 where the community has an existing customary and traditional use determination. However, mapping of community resource harvest areas for Chistochina residents undertaken in conjunction with 1982 household surveys showed traditional moose harvest occurred in a larger area than existing Federal regulation allows. For Unit 12 mapping of moose harvest areas showed residents of Chistochina used the Nabesna River drainage beyond the (A) portion, plus Pickerel Lake in the northern area and along drainages east of the Nabesna River in the (B) area.

> Referring to Map 2 on Page 189, additional information on the use of the eastern and northern portions of Unit 12 by Chistochina was provided in the investigation reports for historical and site applications submitted by AHTNA. Historical occupancy and use of sites on a seasonal basis for subsistence activities, including moose harvesting, throughout the 1970s was described for locations indicated by triangles on Map 2 for the (B) portion and the Pickerel Lake locations north of the winter trail for the (C) portion. Again, these are found on Map 2 on page 189 in your board book.

Transcript at 129-130. This discussion shows documented use by residents of Chistochina only in the southwestern and central portions of Unit 12.

Similarly, the written staff report showed that harvest by Chistochina residents from 1991-2002 occurred only in the A portion of Unit 12 (as labeled in WP05-21, Map 1), Materials at 188, 192. Moose harvest data for 1964-1984 showed use in a wider area than in 1991-2002, but this use still extended only slightly into the

**Exhibit A
Page 8 of 18**

southwestern part of the C portion of Unit 12 and into the west-central part of the B portion of Unit 12:

> For Unit 12, mapping of moose harvest areas showed residents of Chistochina used the Nabesna River drainage beyond the A portion, north to Pickerel Lake and east of the Nabesna River along Stone Creek, Copper Creek, and Camp Creek.

Materials at 193. Likewise, investigations reports for Ahtna historical and cultural site applications supported a finding of customary and traditional use only for a similar limited part of Unit 12:

> Historical occupancy and use of sites on a seasonal basis for subsistence activities (including moose harvesting) throughout the 1970s was described for the Tthiixxa'Cheeg location at the confluence of Cooper Creek with the Nabesna River, BLM F-22390A, the Nach'etay Cheeg location near the confluence of the Cross and Notch Creeks northwest of Chisana, BLM AA-11784A, and the Pickerel Lakes locations, BLM F-22390C, Map 2.

Materials at 193; *see also id.* at 189.

The written staff report did purport to apply the eight factors; however, this analysis was fundamentally flawed because it was not tied to the areas where a historical pattern of use was demonstrated, and it did not show that the same moose populations would be involved. The regulatory requirement for customary and traditional use determinations is to "identify the specific community's or area's use of specific fish stocks and wildlife populations," 36 CFR § 242.16(a); 50 CFR § 100.16(a), thus, wherever the regulations require a "pattern of use" they are referencing a pattern of use of a specific area or of a specific stock or population. Six of the eight factors refer to a "pattern of use." Although the available data might support finding a "pattern of use" for a limited part of the B or C portions of Unit 12, it does not support such a finding for all of Unit 12. Thus, the six factors requiring a "pattern of use" do not support a customary and traditional use determination for all of Unit 12. Further, even the two factors that do not refer to a "pattern of use" are still tied to specific wildlife populations and areas. Factor four contains an explicit geographic reference:

> A consistent harvest and use of fish or wildlife as related to past methods and means of taking; near, or reasonably accessible from the community or area.

36 CFR § 242.16(b)(4); 50 CFR § 100.16(b)(4). Factor five deals only with handling, but implicitly it is tied to the fish stock or wildlife population for which a C&T finding is made; nothing in the staff analysis demonstrates that the same moose populations occur in all of Unit 12. Therefore, none of information addressing the eight factors supports a customary and traditional use determination for all of Unit 12.

Staff acknowledged that "the documented uses by Chistochina residents are concentrated in a portion of Unit 12." Transcript at 134. Nevertheless, Staff supported the proposal for a customary and traditional determination for all of Unit 12, stating that "no additional benefit to management occurs from creating new portions of a unit for customary and traditional findings in Unit 12." Id. "Benefit to management" is not one of the factors for making a customary and traditional use determination; further, this statement is clearly unsupported because the State of Alaska, the primary wildlife manager, requested a careful evaluation and a customary and traditional use determination limited to the areas with an established pattern of use. Id. at 135-36.[3] The state also indicated that increasing the customary and traditional use area could increase take and lead to further restriction of nonfederally qualified subsistence users. Id. at 136-37. There is certainly no demonstrated negative impact on management from restricting harvest to those areas customarily and traditionally hunted by Chistochina residents.

Staff support appears to have been based on simply accepting regional council recommendations. However, the regional council recommendations were not supported by substantial evidence. The Eastern Interior Regional Advisory Council representative indicated that Chistochina residents would have access to Refuge lands only in winter, when it would be feasible to snow machine in, and that an increase in hunting would not be expected because of the harsh conditions. Transcript at 138. The Southcentral Regional Advisory Council representative acknowledged limited documented use in much of Unit 12, but nevertheless seemed to argue that a finding could be based on the fact that someone probably hunted there sometime, and that for the areas around Tok, Tanacross, and Tetlin it was okay to make a finding because of a lack of Federal land:

> Mr. Chair. If we take a look at our map on Page 189 and we look at what we're discussing. Basically we take a line from Slana and we take it over across the top of the Tetlin National Wildlife Refuge and we just look at the documented places that they put on it. They've got one document place, oh, about, I'll say a fourth of the way into the Tetlin National Refuge.

---

[3] As indicated in section III. A. above, ADF&G has developed a proposed customary and traditional use area, accepting all the potential documented sites presented to the Board – including Ahtna historical and cultural sites, with logical geographic boundaries, that would cover only 25 percent of Unit 12, instead of the Unit's full 10,000 square miles. See Attachments 1-3.

> They got one documented place probably right in the middle of what we'd call the (B) portion on the map on Page 188. They've got the other documented places, and those are just specific documented places.
>
> Now, I don't know about you but I know that if somebody hunts out of a place that's documented there, they're basically hunting that area. And I think we could -- I mean as a Council, we felt that we could say that they hunted in Tetlin National Wildlife Refuge. Now, whether they hunted all of Tetlin National Wildlife Refuge we couldn't say that but they did hunt in Tetlin National Wildlife Refuge. They did hunt in Wrangell-St. Elias National Preserve, both portions (A) and (B). That's why we felt that, it's true that if you read this, when you first read it, you know, they've got -- we're saying that they've got C&T up at Tok and Tanacross and Tetlin and all the rest of it but there's no Federal land there. What we looked at as a Council, is we looked at the fact that there was Tetlin National Wildlife Refuge and there's Wrangell-St. Elias National Park.
>
> And Terry's right, there's some little other chunks of Federal land up there along the road system between Northway and Tetlin Junction, there's a couple of little chunks of land that's kind of blocked off below Northway, and I would be real surprised knowing the people, that if they went as far as Pickerel Lake didn't go up to Northway to visit somebody. I can remember one time that I went along with somebody from our local area and we went up to Northway to go muskrat trapping and we headed in from Northway to the Chishana River just basically in that same area right there. It would just really surprise me if they didn't. But we do know that they did go into Tetlin National Wildlife Refuge and they did go into Wrangell-St. Elias National Park and that's why we voted to support their C&T.

Transcript at 139-140.

These comments make it clear that the regional advisory councils did not apply the eight factors to their decision making process and that their recommendations were not consistent with the regulatory definition of customary and traditional use. The factors require a "pattern of use" of the area, and the regulatory definition of customary and traditional use applies only where there "there is a long-established, consistent pattern of use." Such use cannot be established based on the possibility that someone may have hunted in an area at some point, and an erroneous customary and traditional use determination is no less erroneous because there is little or no federal land in a designated area. Therefore, neither the staff nor the Board could reasonably rely on the advisory council recommendations to support a customary and traditional use determination for all of Unit 12.

Exhibit A
Page 11 of 18

Despite extensive documentation of use patterns, use of moose in Unit 12 by residents of Chistochina has only been shown for a small portion of the unit. At most, expanding the area to include logical geographic boundaries, the data might support a customary and traditional use determination for 2,500 square miles, or 25 percent Unit 12.[4] The eight regulatory factors for making a customary and traditional determination have not been properly applied, and could not reasonably be applied to show customary and traditional use by residents of Chistochina in all 10,000 square miles of Unit 12. Any taking of moose from outside the area in which historical use patterns have been shown does not fall within the regulatory definition of "customary and traditional use" because there is no "long-established, consistent pattern of use" of the stock or area. *See* 36 CFR § 242.4; 50 CFR § 100.4.

### B. The regulations are inconsistent with ANILCA because they authorize a subsistence priority for hunting that is not customary or traditional.

Reconsideration is required because, in adopting the customary and traditional use determination, the Board did not adhere to provisions of Section 803 of ANILCA, which authorizes only subsistence uses that are customary and traditional. As shown above, the Board did not have substantial evidence before it that moose hunting in all of Unit 12 was customary and traditional for residents of Chistochina.

"[R]egulations, in order to be valid, must be consistent with the statute under which they are promulgated." *United States v. Larionoff*, 431 U.S. 864, 873, 97 S.Ct. 2150, 2156 (1977). ANILCA authorizes only subsistence uses that are "customary and traditional." Section 803 of ANILCA defines "subsistence uses" as follows:

> As used in this act, the term "subsistence uses" means the customary and traditional uses by rural Alaska residents of wild, renewable resources for direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation; for the making and selling of handicraft articles out of nonedible byproducts of fish and wildlife resources taken for personal or family consumption; for barter, or sharing for personal or family consumption; and for customary trade.

16 U.S.C. § 3113 (emphasis added). To be a valid subsistence use under this section, then, any hunting allowed must be "customary and traditional." This statute should also be narrowly construed because it constitutes a federal encroachment on a basic aspect of

---

[4]   *See* Attachments 1, 2.