DAVID W. MÁRQUEZ
ATTORNEY GENERAL

Steven A. Daugherty
Assistant Attorney General
1031 W. 4th Avenue, Suite 200
Anchorage, Alaska 99501
Ph: (907) 269-5232
Fax: (907) 279-2834
Email: steven_daugherty@law.state.ak.us

Counsel for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| STATE OF ALASKA,⟩ | |
| ⟩ | Case No. 3:06-cv-00107-HRH |
| Plaintiff, ⟩ | |
| ⟩ | |
| v. ⟩ | |
| ⟩ | |
| MICHAEL FLEAGLE Chairman, ⟩ | |
| FEDERAL SUBSISTENCE BOARD, ⟩ | |
| DIRK KEMPTHORNE, ⟩ | |
| Secretary of the Interior, ⟩ | |
| MIKE JOHANNS, Secretary of the U.S. ⟩ | |
| Department of Agriculture, ⟩ | |
| [each in their official capacity] ⟩ | |
| ⟩ | |
| Defendants. ⟩ | |
| ⟩ | |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.  INTRODUCTION..................................................................................................1

II.  BACKGROUND ...............................................................................................1

III. STANDARD OF REVIEW..............................................................................10

IV.  ARGUMENT ...................................................................................................12

   A. The Boards Adoption of a Customary and Traditional Use Determination
      for Moose for Residents of Chistochina in all of Unit 12, When the
      Record Provided Substantial Evidence of Past Use in Only a Small
      Portion of the Unit, is Inconsistent with Subsistence Management
      Regulations.................................................................................................12

     1.  The Chistochina Unit 12 moose C&T determination is inconsistent with
        the regulatory definition of customary and traditional use at 50 C.F.R  §
        100.4. ...................................................................................................13

     2.  The Chistochina Unit 12 moose C&T determination was inconsistent
        with application of the regulatory criteria for finding customary and
        traditional use.....................................................................................15

   B.  The Board's Adoption of a Customary and Traditional Use Determination
      for Moose for Residents of Chistochina in all of Unit 12, When the
      Record Provided Substantial Evidence of Past Use in Only a Small
      Portion of the Unit, is Inconsistent with ANILCA. .................................25

     1.  The regulations are inconsistent with ANILCA's definition of
        "subsistence uses" because they authorize a subsistence priority for
        hunting that is not customary or traditional.........................................25

     2.  The regulations are inconsistent with ANILCA's prohibition on
        unnecessary restriction of nonsubsistence uses. ...................................27

   C.  The Regulations Are Arbitrary And Capricious.....................................32

V.  CONCLUSION.................................................................................................34

## I.  INTRODUCTION

Plaintiff, State of Alaska, challenges an administrative rulemaking of the Federal Subsistence Board expanding a customary and traditional use determination (C&T determination) for moose for the community of Chistochina to include all 10,000 square miles of Game Management Unit 12 based on an administrative record that demonstrates actual use of only a small portion of the unit.  The State requests summary judgment holding that because the record demonstrates C&T use for only a small portion of Unit 12, the Federal Subsistence Board acted arbitrarily and capriciously and in violation of its statutes and regulations when it made a customary and traditional use determination for the entire game management unit.

## II.  BACKGROUND

In May 2005, the Board considered Proposal WP05-21, submitted by the Cheesh-na Tribal Council, amending the sections of 36 CFR § 242.24 and 50 CFR § 100.24[1] dealing with Unit 12 moose customary and traditional use determinations as follows:

Unit 12 – Moose
Customary and Traditional Use Determination
(The areas are labeled A, B, and C for this analysis only)

*A.  Unit 12 — south of a line from Noyes Mountain, southeast of the confluence of Tatschunda Creek to Nabesna River.*

*Residents of Unit 11 north of 62nd parallel, Unit 12, 13A-D and the residents of Chickaloon, Dot Lake, and Healy Lake.*

---

[1]    The Board's regulations are promulgated identically in both 36 C.F.R. part 242 and 50 C.F.R. part 100; throughout the remainder of this brief citations to 50 C.F.R. part 100 are used to refer to regulations appearing in both parts.

|   |   |
|---|---|
| *B.  Unit 12 — east of the Nabesna River and Nabesna Glacier, south of the Winter Trail from Pickerel Lake to the Canadian Border.* | *Residents of Unit 12,* **Chistochina**, *and Healy Lake.* |
| *C.  Unit 12 — remainder* | *Residents of Unit 12,* **Chistochina,** *Dot Lake, Healy Lake, and Mentasta Lake.*[2] |

The proposal of the Cheesh-na Tribal Council, while seeking a C&T determination for all of Unit 12, only asserted that moose had been harvested in the portion of the unit "east of the Nabesna river and south of the Winter Trail."[3]

The record developed before the Board supported only a small expansion of the C&T determination, largely consistent with the area of use cited in the proposal, where Chistochina's use extended into C&T areas previously designated for other communities.[4]  The Board's interagency staff testimony to the Board indicated that "[t]he documented uses by Chistochina residents are concentrated in a portion of Unit 12."[5]  No substantial evidence of use outside the southwest portion of the unit was shown.[6]  Only a

---

[2]      Record Tab 34, 1682 (Meeting Materials p. 187).

[3]      Record Tab1, 1-2.

[4]      *See, e.g.*, Record Tab 35, 2149-50 (Transcript at 129-30)(OSM staff discussion of areas where Chistochina subsistence use activities and Ahtna historical and cultural sites extend into "B" and "C" portions of Unit 12).

[5]      Record Tab 35, 2154 (Transcript at 134).

[6]      *See, e.g.,* Record  Tab 34, 1684, 1688, 1690 (Meeting Materials at 189)(showing Ahtna historical and cultural sites based on four BIA studies); Record  Tab 34, 1687-88 (Meeting Materials at 192-93)(showing 1991 – 2002 harvests by Chistochina residents only in the "A" portion of the Unit and showing that 1982 household survey results showed use only as far north as Pickerel Lake and east of the Nabesna River along Stone Creek, Cooper Creek, and Camp Creek); Record Tab 41, 2525 (showing hunting area used by Chistochina residents 1964-1984) (State's RFR Attachment 3).

couple of general unsupported statements in the record could be interpreted to provide any support for a finding relating to all of Unit 12.[7]  Despite the lack of evidence for most of Unit 12, interagency staff supported a C&T finding for all of Unit 12, arguing that "no additional benefit to management occurs from creating new portions of a unit for customary and traditional findings in Unit 12."[8]  The Board adopted the proposal, providing a C&T determination throughout all of Unit 12, without change.[9]

The effect of the regulatory amendment was to provide a federal priority preference for harvest of moose on federal lands within an additional 8,867 square miles of Unit 12 to residents of Chistochina.[10]  As a result of this preference, residents of Chistochina are now eligible to participate in expanded seasons with less restrictive harvest limitations on all federal lands within Unit 12.  Nonlisted rural residents, along with other state users are not eligible to hunt during some of these seasons, and have

---

[7]     See Record Tab 3, 51 (Ahtna Tene Nene' Subsistence Committee Comment page 2)(Supporting the proposal providing Chistochina a determination of moose throughout all of Unit 12 by stating "They have customarily and traditionally used Unit 12 to hunt for caribou, moose, sheep, and other wildlife.  Unit 12 is their traditional area to hunt for caribou, moose, and sheep, etc.  They have used these areas for thousands of years to take wildlife for their livelihood."); Record Tab 35, 2151-52 (Transcript at 131-32)(Statement of William Justin, subsistence advocate for the Cheesh-na Tribal Council arguing that "All of the residents of Chistochina, including the non-Native residents have established a clear and relatively consistent use of Unit 12, perhaps not very visible, but still clear use," but then providing specific information relating only to the portion of the unit between the Nabesna, Pickerel Lakes and Chisana.

[8]     Record Tab 35, 2154 (Transcript at 134).

[9]     See Record Tab, 35 2160-61 (Transcript at 140-41); Record Tab 39, 2287 (70 Fed. Reg. 36274).

[10]     See Record Tab 41, 2523 (State's RFR, Attachment 1).

different harvest restrictions when allowed to hunt.[11]  This preference extends to areas of Unit 12 in which, despite extensive studies, there has been no documented history of moose hunting by residents of Chistochina.[12]

Chistochina is a community with approximately 93 residents, located on the Tok Cut-off of the Glenn Highway in Unit 13C very close to the boundary of Unit 11.[13] Prior to the regulatory amendments, Chistochina residents could already hunt moose on federal lands under federal subsistence regulations in all of Unit 13 (23,368 square miles), all of Unit 11(12,785 square miles), and the portion of Unit 12 labeled "A" above (1,333 square miles).[14]  Prior to the regulatory amendments, the area in which Chistochina residents had customary and traditional use determinations for moose totaled approximately 37,286 square miles; the regulatory amendments expanded this area to approximately 46,153 square miles.[15]

---

[11]    *Compare* 5 AAC 85.045(a)(10) *and* 50 C.F.R. § 100.26(n)(12).

[12]    *See, e.g.,* Record Tab 34, 1684, 1688, 1690 (Meeting Materials at 189)(showing Ahtna historical and cultural sites based on four BIA studies); Record Tab 34, 1687-88 (Meeting Materials at 192-93)(showing 1991 – 2002 harvests by Chistochina residents only in the "A" portion of the Unit and showing that 1982 household survey results showed use only as far north as Pickerel Lake and east of the Nabesna River along Stone Creek, Cooper Creek, and Camp Creek); Record Tab 45, 2525 (showing hunting area used by Chistochina residents 1964-1984) (State's RFR Attachment 3).

[13]    *See, e.g.,* Record Tab 41, 2511 (State's RFR at 2).

[14]    *See, e.g.,* 69 Fed Reg. 40,174, 40,181 (July 1, 2004)(including C&T determination for Residents of the Units 13(A)-(D)); Record Tab 41, 2523 (State's RFR at Attachment 1).

[15]    *See* Record Tab 41, 2523 (State's RFR at Attachment 1).

As a result of the regulatory change, residents of Chistochina were granted the right to participate in all federal moose hunts in Unit 12 as well, including antlered bull federal hunts in the Tetlin National Wildlife Refuge and portions of the Wrangell – St. Elias National Preserve; in much of this area they would be limited by spike fork, 50-inch or 4 brow tine limitation under state law.[16]  The regulatory change also granted the ability participate in a federal registration hunt in these areas from November 20 through November 30 during a state season closure.[17]

The expanded hunt area also includes the portion of the Unit 12 east of the Nabesna River and south of the winter trail, running southeast from Pickerel Lake to the Canadian Border, where the regulatory change granted the right to participate in antlered bull federal hunts where they would be limited by a 50-inch or 4 brow tine limitation under state law.  The regulatory change also allowed additional hunting time from August 24 through August 31, before the opening of the state season on September 1.[18]

In the northern half of Unit 12, on federal lands, the regulatory change gave residents of Chistochina an expanded federal season from August 15 through August 23, from September 1 through 7, and from September 18 through 30.[19]

These changes can be expected to increase participation, harvest, and competition within the federal subsistence hunts.  Increased harvest of animals not

---

[16]     *Compare* 5 AAC 85.045(a)(10) *and* 50 C.F.R. § 100.26(n)(12).
[17]     *Id.*
[18]     *Id.*
[19]     *Id.*

eligible for harvest under state regulations may require adjustment of seasons and harvest restrictions under state law, and in the future, may also lead to further restrictions on both subsistence and nonsubsistence uses on federal lands.[20]

As a result of the regulatory change, the customary and traditional use determination for Chistochina in Unit 12 expanded from 1,333 square miles to include all 10,000 square miles in the unit.[21]  Much of the 206 square miles of area within Unit 12 where use by residents of Chistochina was shown through household surveys for 1964-1984 were already covered by the prior customary and traditional use determination,[22] and household harvest data indicates that all of the moose harvests from 1991-2002 occurred within the area covered by the prior customary and traditional use determination.[23]  All of the Chistochina historical harvest sites in Unit 12, including

Ahtna historical and cultural sites, given logical geographical boundaries, would encompass an area of less than 2,500 square miles.[24]

//

//

---

[20]    *See* Record Tab 35, 2156-57 (Transcript at 136-37)(State's oral comments); *see also* Alaska Const. art. VIII, § 4 (requirement for sustained yield management).

[21]    Record Tab 41, 2523 (State's RFR at Attachment 1).

[22]    *Compare* Record Tab 34,1683 (Prior determination area labeled A on map) *and* Record 2524 (Map showing hunting areas 1964-1984).

[23]    *See, e.g.,* Record Tab 34, 1687 (Meeting materials at 192).

[24]    *Compare* Record Tab 34,1683-84, 1687-88 (Meeting Materials 188-89 (maps), 192-93(describing harvest areas) *and* Record  Tab 41, 2523-25 (State's RFR Attachments 1-3)(State summary of data and maps of use areas and potential C&T area).

ADF&G submitted a Request for Reconsideration (WRFR05-02) on August 18, 2005, asking the Board to reconsider its action and instead adopt regulations finding customary and traditional use only in those portions of Unit 12 where a history of use by residents of Chistochina has been shown.[25]  In its request, ADF&G argued that the Board's regulatory action was in error or contrary to existing law for the following reasons:

1)  Data presented to the Board clearly showed that Chistochina's historical use was limited to a small portion of Unit 12;

2)  The Board's finding of customary and traditional use for Chistochina for all of Unit 12, based on a record showing use of only a small portion of the unit was inconsistent with the regulatory definition of "customary and traditional use" at 36 CFR 242.4 and 50 CFR 100.4;

3)  The Board's finding of customary and traditional use for Chistochina for all of Unit 12, based on a record showing use of only a small portion of the unit was inconsistent with the regulatory criteria for making customary and traditional use determinations at 36 CFR 242.16 and 50 CFR 100.16;

4)  The Board's regulatory action authorized a subsistence preference for a use that does not fall within ANILCA Section 803's definition of "subsistence uses" because "subsistence uses" are limited to "customary and traditional uses;"

5)  The Board's regulatory action authorized an "unnecessary restriction of nonsubsistence use" in violation of Section 815 of ANILCA; and

6)  The Board's regulatory action was arbitrary and capricious because it was not supported by the record.[26]

The State's request was denied on January 17, 2006.[27]

//

//

---

[25]    Record Tab 41, 2509-25 (State's RFR).

[26]    *See* Record Tab 41, 2510(States RFR at 1)(paraphrased summary).

[27]    Record Tab 49, 2661 – 2663 (RFR denial).

ADF&G suggested in its August 18, 2005 RFR that an appropriate description of a customary and traditional use area for moose in Unit 12, encompassing all documented historical and cultural sites, would be:

> The portion of Game Management Unit 12 that includes the drainage of the Nabesna River upstream from the mouth of Lick Creek, and the area south of and including the Pickerel Lake Winter Trail from Lick Creek to the Chisana River.[28]

This area would constitute approximately 2,500 square miles, or ¼ of the 10,000 square miles in Unit 12.[29]

The Board, in its rejection of ADF&G's RFR, argued that the information presented in the RFR, did not represent "new information" but a "repackaging of information the Board had before it," and argued that a C&T determination for all of Unit 12 was appropriate because

> both the State and the Board acknowledge that moose hunting is a customary and traditional use as defined by section 803 of ANILCA and the Residents of Chistochina have hunted in certain parts of unit 12. This is sufficient to support the Board's decision.[30]

The Board also rejected the State's argument that the unnecessary expansion of the C&T area was an unnecessary restriction on nonsubsistence use in violation of section 815 of ANILCA.[31] The Board's decision was based on a staff

---

[28]    Record Tab 41, 2512-13, 2523-25 (State's RFR pages 3-4, Attachments 1, 2, and 3).

[29]    *See, e.g.,* Record Tab 41, 2523-24 (State's RFR Attachments 1, 2).

[30]    Record Tab 49, 2662 (RFR denial at 2).

[31]    *See* Record Tab 41, 2520-21 (RFR at 11-12); Record Tab 49, 2662 (RFR denial at 2).

analysis arguing that a C&T determination "does not allocate resources between users," and that the State's concerns were "based in the unfounded assumption that the expanded C&T use determination will lead to the taking of additional moose."[32]  This analysis failed to acknowledge the fact that under the federal subsistence program structure, a C&T determination is a prerequisite to providing a federal subsistence preference over nonsubsistence uses in any unit in which a determination has been made,[33] and that the designation automatically increased the number of individuals afforded such a preference in Unit 12.[34]  This analysis also failed to recognize statements from the State indicating that moose populations in part of Unit 12 were already under pressure and that increased hunting pressure would be likely to increase pressure to close the lands to non-Federally qualified users,[35] and that there would be cumulative impacts on other users as new communities are added.[36]  The staff analysis assumption that take was unlikely to increase because of the nature of subsistence hunting[37] also overlooked the fact that the

//

//

---

[32]    Record Tab 49, 2668 (Threshold analysis at 5).
[33]    *See* 50 C.F.R. § 100.24(a) ("When there is a determination for specific communities or areas of residence in a Unit, all other communities not listed for that species in that Unit have no Federal subsistence priority for that species in that Unit.").
[34]    *See* 50 C.F.R. § 100.26(n)(12); *see also* discussion above of results of the regulatory change.
[35]    Record Tab 35, 2156 (Transcript at 136).
[36]    *See id.* at 2157 (Transcript at 137).
[37]    Record Tab 49, 2668 (Threshold Analysis at 5).

moose harvest success rate and average household consumption levels of Chistochina residents have been lower than those of some Unit 12 communities.[38]

## III. STANDARD OF REVIEW

Section 706(2) of the Administrative Procedure Act ("APA") (5 U.S.C. § 706(2)) sets forth the standard of review of agency action.   Under this standard, the Court must:

> "(2)    hold unlawful and set aside agency action, findings, and conclusions found to be—
> (A)    arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (B)    contrary to constitutional right, power, privilege, or immunity;
> (C)    in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> (D)    without observance of procedure required by law …."

5 U.S.C. § 706(2).

Court review of federal agency regulatory interpretation of statutes administered by that agency is governed first by a simple inquiry:  if Congress has "directly spoken to the precise question" and "the intent of Congress is clear that is the end of the matter."[39]   The agencies are required to give affect to the unambiguously

---

[38]    *See* Record Tab 34 at 1687 (Meeting Materials at 192)(During the 1991 2002 period, Chistochina residents harvested 26 moose with a household harvest success rate of 28.6 percent and household consumption level of 144.64  pounds; this compared to success rates as high as 34.5 % in Tetlin and household consumption rates as high as 268.75 pounds in Northway).

[39]    *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 842 (1984).

expressed or plain intent of Congress.[40]  Agencies have interpretive latitude and receive

deference from a reviewing court only if the statute is ambiguous or silent regarding a

specific issue.[41]  Under this first prong of *Chevron* analysis, regulations inconsistent with

the plain meaning of the statute are considered arbitrary and capricious and not in

accordance with law.[42]  Under the second prong of *Chevron* analysis, where there is an

implicit legislative delegation to an agency, an agency's construction of a statutory

provision must be set aside as arbitrary and capricious if it is not a reasonable

interpretation consistent with the statute and its legislative history.[43]

   An agency determination is considered arbitrary and capricious if the

agency has 1) relied on factors that Congress has not intended it to consider; 2) entirely

failed to consider an important aspect of the problem; or 3) offered an explanation for its

decision that runs counter to the evidence before the agency, or is so implausible that it

could not be ascribed to a difference in view or the product of agency expertise.[44]

   Summary Judgment should be granted if "there is no genuine issue as to

any material fact" and "the moving party is entitled to judgment as a matter of law."[45]

---

[40] *Id.*

[41] *Id.* at 843.

[42] 5 U.S.C. § 706(2)(A).

[43] 467 U.S. at 844-845.

[44] *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual*, 463 U.S. 29, 42-43 (1983).

[45] Rule 56(c), Federal Rules of Civil Procedure.

## IV.  ARGUMENT

The Board's regulatory C&T determination providing a subsistence preference to residents of Chistochina in all 10,000 square miles of Unit 12, despite a record documenting a history of use in only a small portion of the unit, was inconsistent with subsistence management regulations and with the statutory text of ANILCA and was arbitrary and capricious.

> **A.   The Boards Adoption of a Customary and Traditional Use Determination for Moose for Residents of Chistochina in all of Unit 12, When the Record Provided Substantial Evidence of Past Use in Only a Small Portion of the Unit, is Inconsistent with Subsistence Management Regulations.**

The Board made a customary and traditional use determination for all 10,000 square miles of Unit 12 despite the fact that community resource harvest area data (1964-1984) demonstrated use of only 206 square miles, and despite the fact that all areas with any documented use, including Ahtna historical and cultural sites, could have been easily encompassed in a geographically logical area of only 2,500 square miles.[46]  Thus, the Board's C&T determination was unreasonable because it created a new subsistence preference for residents of Chistochina in an area in which they had no history of customary and traditional use.  As shown below, this determination was inconsistent with the Board's regulatory definition of customary and traditional use at 50 CFR 100.4, with

---

[46]   *See Supra* section II; *see also* Record Tab 41, 2523-24 (State's RFR Attachments 1, 2).

the Board's regulatory procedures for making a customary and traditional use determination at 50 CFR § 100.14.

**1.    The Chistochina Unit 12 moose C&T determination is inconsistent with the regulatory definition of customary and traditional use at 50 C.F.R § 100.4.**

The regulatory definition of "customary and traditional use," is: "[A] long-established, consistent pattern of use, incorporating beliefs and customs which have been transmitted from generation to generation.  This use plays an important role in the economy of the community."[47]

For the majority of Unit 12, the record before that Board did not show <u>any</u> history of use by Chistochina residents, much less a "long established consistent pattern of use," as required by the regulatory definition.  Recent use history (1991-2002) showed moose harvest by Chistochina residents only in 206 square mile portion of the unit where the community already had a customary and traditional use determination.[48]  The only Ahtna historical and cultural sites mentioned in the record are concentrated in the Southwestern portion of the unit.[49]  Both areas of recent use and historical and cultural

//

//

---

[47]    50 C.F.R. § 100.4.

[48]    *See* Record Tab 34, 1687 (Meeting materials at 192); Record Tab 41, 2523-25 (RFR attachments describing and mapping areas of use); Record Tab 32, 1683 (Meeting materials map showing area "A" where prior determination applied).

[49]    *See* Record Tab 34, 1684 (Meeting materials Map 2).

sites could have been easily encompassed in a geographically logical area of only 2,500 square miles.[50]

The Interagency Staff Committee acknowledged that documented uses of Chistochina residents are "concentrated in a portion of Unit 12," and that the Board "has a varying practice in which some customary and traditional use determinations are for whole units, while some are attributed to subunits, or portions of units."[51]  Interagency Staff provided no explanation of how making a customary and traditional use determination for an entire unit, despite a record showing use of only a small discrete portion of the unit, could be consistent with regulatory definition requiring a "long established consistent pattern of use" and requiring that use to play "an important role in the economy of the community."[52]

The Board's regulatory action making a customary and traditional use determination for moose for Chistochina residents in all of Unit 12, despite a record that

---

[50]     *Compare* Record Tab 41, 2523-25 (RFR attachments describing and mapping areas of use) *and* Record Tab 34, 1684 (Meeting materials Map 2 showing Ahtna historical and cultural sites).

[51]     Record Tab 34, 1680 (Meeting materials).

[52]     *See id.* (The Interagency Staff simply concluded, without analysis and contrary to the recommendation of the primary wildlife management agency (ADF&G), that "no additional benefit to management occurs from creating new portions of the unit for customary and traditional finings in Unit 12.") *Id.*; *see also* Record Tab 25, 1087 (email from Terry Haines explaining State Opposition to the proposal); Record Tab 27, 1419 (ADF&G comments for ISC Meeting); Record Tab 34, 1856 (ADF&G Final Comments on 2005-06 Federal Subsistence Wildlife proposals at 9); Record Tab 35, 2155-57 (Transcript  at 135-37 including ADF&G oral comments and discussion of those comments).

could support a finding in only a discrete portion constituting 1/4 or less of the unit, is

inconsistent with the regulatory definition of "customary and traditional use" because for

at least 75 percent of the Unit, the record did not establish any pattern of use, let alone

demonstrate the required "long established consistent pattern of use" that "plays an

important role in the economy of the community."[53]

> 2. **The Chistochina Unit 12 moose C&T determination was inconsistent with application of the regulatory criteria for finding customary and traditional use.**

The Board's regulations require the Board to determine which fish stocks

and wildlife populations have been customarily and traditionally used for subsistence and

to identify the specific community's or area's use of specific fish stocks and wildlife

populations.[54] Eight specific factors, which must be "generally exhibited," are

established for finding customary and traditional use:

> (1) A long-term consistent pattern of use, excluding interruptions beyond the control of the community or area;
> (2) A pattern of use recurring in specific seasons for many years;
> (3) A pattern of use consisting of methods and means of harvest which are characterized by efficiency and economy of effort and cost, conditioned by local characteristics;
> (4) The consistent harvest and use of fish or wildlife as related to past methods and means of taking; near, or reasonably accessible from, the community or area;
> (5) A means of handling, preparing, preserving, and storing fish or wildlife which has been traditionally used by past generations, including consideration of alteration of past practices due to recent technological advances, where appropriate;

---

[53]    *See* 50 C.F.R. § 100.4.
[54]    50 C.F.R. § 100.16(a).

     (6) A pattern of use which includes the handing down of knowledge of fishing and hunting skills, values, and lore from generation to generation;

     (7) A pattern of use in which the harvest is shared or distributed within a definable community of persons; and

     (8) A pattern of use which relates to reliance upon a wide diversity of fish and wildlife resources of the area and which provides substantial cultural, economic, social, and nutritional elements to the community or area.

50 CFR § 100.16(b).

The eight factors were not discussed by the Board members,[55] and the written staff analysis focused on general subsistence use issues without showing use in all of Unit 12.[56] The only factor explicitly discussed before the Board was factor four, and that discussion did not support the Board's determination:

     Under factors for determining customary and traditional uses, Factor 4, which begins on Page 192[57], addresses their consistent harvest for the area. The available household harvest data for Chistochina residents from 1991 to 2002 shows the harvest of moose in the portion labeled (A) of Unit 12[58] where the community has an existing customary and traditional use determination. However, mapping of community resource harvest areas for Chistochina residents undertaken in conjunction with 1982 household surveys showed traditional moose harvest occurred in a larger area than existing Federal regulation allows. For Unit 12 mapping of moose harvest areas showed residents of Chistochina used the Nabesna River drainage beyond the (A) portion, plus Pickerel Lake in the northern area and along drainages east of the Nabesna River in the (B) area.

     Referring to Map 2 on Page 189,[59] additional information on the use of the eastern and northern portions of Unit 12 by Chistochina was

---

[55]    *See* Record Tab 35, 2148-61 (Transcript at 128-141).

[56]    *See* Record Tab 34, 1686-89 (Meeting materials at 191-194).

[57]    Record Tab 34, 1687.

[58]    *See* Record Tab 35, 1683 (Meeting Materials page 188, Map 1).

[59]    Record Tab 35, 1683.

provided in the investigation reports for historical and site applications submitted by AHTNA. Historical occupancy and use of sites on a seasonal basis for subsistence activities, including moose harvesting, throughout the 1970s was described for locations indicated by triangles on Map 2 for the (B) portion and the Pickerel Lake locations north of the winter trail for the (C) portion. Again, these are found on Map 2 on page 189 in your board book.[60]

This discussion shows documented use by residents of Chistochina only in the southwestern portion of Unit 12.

Similarly, the written staff report showed that harvest by Chistochina residents from 1991-2002 occurred only in the southwestern portion of Unit 12.[61] Moose harvest data for 1964-1984 showed use in a wider area than in 1991-2002, but this use still extended only slightly into the southwestern part of the C portion[62] of Unit 12 and into the west-central part of the B portion[63] of Unit 12:

> For Unit 12, mapping of moose harvest areas showed residents of Chistochina used the Nabesna River drainage beyond the A portion[64], north to Pickerel Lake and east of the Nabesna River along Stone Creek, Copper Creek, and Camp Creek.[65]

Likewise, investigations reports for Ahtna historical and cultural site applications supported a finding of customary and traditional use only for a similar limited part of Unit 12:

---

[60]    Record Tab 35, 2149-50 (Transcript at 129-130)(footnotes added).
[61]    Record Tab 35, 1683, 1687 (Meeting materials 188, 192)(Map 1 and discussion showing harvest from 1991 – 2002 only "in the A portion of Unit 12").
[62]    *See* Record Tab 35, 1683 (Meeting Materials Map 1).
[63]    *See id.*
[64]    *See id.*
[65]    Record Tab 35, 1688 (Meeting materials at 193)(footnote added).

Historical occupancy and use of sites on a seasonal basis for subsistence activities (including moose harvesting) throughout the 1970s was described for the Tthiixxa'Cheeg location at the confluence of Cooper Creek with the Nabesna River, BLM F-22390A, the Nach'etay Cheeg location near the confluence of the Cross and Notch Creeks northwest of Chisana, BLM AA-11784A, and the Pickerel Lakes locations, BLM F-22390C, Map 2.[66]

All of the areas where the record indicated use had occurred, including historical and cultural sites, are included within a discrete, geographically logical portion of the unit consisting of only 25 percent of the 10,000 square miles in the unit.[67]  This area was logically described in ADF&G's RFR as:

The portion of Game Management Unit 12 that includes the drainage of the Nabesna River upstream from the mouth of Lick Creek, and the area south of and including the Pickerel Lake Winter Trail from Lick Creek to the Chisana River.)[68]

The written staff report did purport to apply the eight factors for making a customary and traditional use determination under 50 CFR § 100.16; however, this analysis was fundamentally flawed because it was not tied to the areas where a historical pattern of use was demonstrated, and it did not show that the same moose populations would be involved.

The regulatory requirement for customary and traditional use determinations under 50 CFR § 100.16(a) is to "identify the specific community's or area's use of specific fish stocks and wildlife populations;" thus, wherever the regulations

---

[66]     Record Tab 35, 1684 (Meeting materials at 189).

[67]     *See* Record Tab 41, 2513, 2523-25 (State's RFR at 4, Attachments 1-3).

[68]     Record Tab 41, 2513.

require a "pattern of use" they are referencing a pattern of use of a specific area or of a specific stock or population. Six of the eight factors refer to a "pattern of use." Although the available data might support finding a "pattern of use" for a limited part of the B or C portions of Unit 12, it could not reasonably support such a finding for the majority of Unit 12. Thus, the six factors requiring a "pattern of use" do not support a customary and traditional use determination for all of Unit 12.

Even the two factors that do not refer to a "pattern of use" are still tied to specific wildlife populations and areas and the record does not show that these criteria were satisfied either. Factor four contains an explicit geographic reference:

> A consistent harvest and use of fish or wildlife as related to past methods and means of taking; near, or reasonably accessible from the community or area.[69]

Nothing in the record showed <u>any</u> taking of moose by residents of Chistochina in the majority of Unit 12, not to mention "a consistent harvest and use," and the record also failed to establish that the more distant portions of Unit 12 are "near, or reasonably accessible from the community or area." Factor five deals only with handling, but implicitly it is tied to the fish stock or wildlife population for which a C&T finding is made; nothing in the record indicates that the same moose populations occur in all of Unit 12. Therefore, based on the Board's record even the two factors that do not refer to

---

[69]    50 C.F.R. § 100.16(b)(4).

a "pattern of use" could not support a customary and traditional use determination for all of Unit 12.

The Interagency Staff Committee acknowledged that "the documented uses by Chistochina residents are concentrated in a portion of Unit 12."[70] Nevertheless, Interagency Staff supported the proposal for a customary and traditional determination for all of Unit 12, stating that "no additional benefit to management occurs from creating new portions of a unit for customary and traditional findings in Unit 12."[71] "Benefit to management" is not a factor for making a customary and traditional use determination; further, this statement is clearly unsupported because the Alaska Department of Fish and Game, the primary wildlife manager,[72] requested a careful evaluation and a customary and traditional use determination limited to the areas with an established pattern of use.[73] The State also indicated that increasing the customary and traditional use area could increase take and lead to further restriction of nonfederally qualified subsistence users.[74] In any event, the record also failed to demonstrate any negative impact or disadvantage to

//

//

---

[70]    Record Tab 35, 2154 (Transcript at 134).

[71]    *Id.*

[72]    ADF&G is responsible for ensuring that the sustained yield management provision of Alaska's Constitution is not violated and is also responsible for management of subsistence and recreational hunting by nonfederally qualified hunters. *See* Alaska Const. art VIII, § 4; AS 16.05.020.

[73]    Record Tab 35, 2155-56 (Transcript at 135-36).

[74]    *Id.* at 2156-57.

management that would result from restricting harvest to those areas customarily and traditionally hunted by Chistochina residents.[75]

Interagency Staff support appears to have been based on simply accepting regional council recommendations. However, the regional council recommendations were not supported by substantial evidence addressing the eight factors. The Eastern Interior Regional Advisory Council representative indicated that Chistochina residents would have access to Refuge lands only in winter, when it would be feasible to snow machine in, and that an increase in hunting would not be expected because of the harsh conditions.[76] The Southcentral Regional Advisory Council representative acknowledged limited documented use in much of Unit 12, but nevertheless seemed to argue that a finding could be based on the fact that someone probably hunted there sometime, and that

---

[75]  The only inconvenience would be the necessity of addition of a couple of lines of language in the regulation further specifying the area of actual customary and traditional use, this cannot be considered legal justification for a regulation inconsistent with other regulations and with statutory requirements. C&T areas already did not correspond fully with harvest regulation boundaries in Unit 12. *Compare* 50 C.F.R. § 100.24(a)(1) *and* 50 C.F.R. § 100.26(n)(12)*; see also* Record Tab 15, 464 (Eastern Interior Transcript at 70)(Statement of Ms. Cellarius indicating that the C&T designations are "ordered differently" and "somewhat different geographically from the areas described for the harvest areas" and that "you have to read the C&T determination areas totally separately from the harvest area designations.")

[76]  Record Tab 35, 2158 (Transcript at 138). As shown above, the effect of the customary and traditional use determination is significantly greater than the Eastern Interior representative thought, allowing harvest of animals not eligible for harvest under State regulations, allowing an increased early season as well as an additional winter season. *See supra* Section I.

for the areas around Tok, Tanacross, and Tetlin it was okay to make a finding because of

a lack of Federal land:

> Mr. Chair.  If we take a look at our map on Page 189 and we look at what we're discussing.  Basically we take a line from Slana and we take it over across the top of the Tetlin National Wildlife Refuge and we just look at the documented places that they put on it.  They've got one document place, oh, about, I'll say a fourth of the way into the Tetlin National Refuge.  They got one documented place probably right in the middle of what we'd call the (B) portion on the map on Page 188.  They've got the other documented places, and those are just specific documented places.
>
> Now, I don't know about you but I know that if somebody hunts out of a place that's documented there, they're basically hunting that area.  And I think we could -- I mean as a Council, we felt that we could say that they hunted in Tetlin National Wildlife Refuge.  Now, whether they hunted all of Tetlin National Wildlife Refuge we couldn't say that but they did hunt in Tetlin National Wildlife Refuge.  They did hunt in Wrangell-St. Elias National Preserve, both portions (A) and (B).  That's why we felt that, it's true that if you read this, when you first read it, you know, they've got -- we're saying that they've got C&T up at Tok and Tanacross and Tetlin and all the rest of it but there's no Federal land there.  What we looked at as a Council, is we looked at the fact that there was Tetlin National Wildlife Refuge and there's Wrangell-St. Elias National Park.
>
> And Terry's right, there's some little other chunks of Federal land up there along the road system between Northway and Tetlin Junction, there's a couple of little chunks of land that's kind of blocked off below Northway, and I would be real surprised knowing the people, that if they went as far as Pickerel Lake didn't go up to Northway to visit somebody.  I can remember one time that I went along with somebody from our local area and we went up to Northway to go muskrat trapping and we headed in from Northway to the Chishana River just basically in that same area right there.  It would just really surprise me if they didn't.  But we do know that they did go into Tetlin National Wildlife Refuge and they did go into Wrangell-St. Elias National Park and that's why we voted to support their C&T.[77]

---

[77]     Record Tab 35, 2159-60 (Transcript at 139-140).

These comments make it clear that the regional advisory council positions were not based

on application of the eight regulatory factors.   Review of the transcripts of the two

relevant advisory committees also fails to show any substantive discussion of the

regulatory customary and traditional use factors with respect to portions of Unit 12

outside of the southwest section of the Unit.[78]  The regulatory factors, consistent with the

regulatory definition of customary and traditional use, require a "pattern of use" of the

area.  Such a "pattern of use" cannot be established based on the possibility that someone

may have hunted in an area at some point, and an erroneous customary and traditional use

determination is no less erroneous because there is little federal land in a designated area.

Therefore, neither the Staff nor the Board could reasonably rely on the advisory council

recommendations to support a customary and traditional use determination for all of

Unit 12.

            The record included review of extensive documentation of use patterns for

use of moose in Unit 12 by residents of Chistochina, but this documentation provided

support for a customary and traditional use determination for only a small portion of the

---

[78]      *See* Record Tab 15, 455-68 (Eastern Interior Transcript at 61-74) (The only substantive discussion of the C&T factors was in the staff report provided by the Office of  Subsistence management; this report essentially mirrored the report provided to the Board demonstrating a history of use only in the southwest section of  Unit 12.  There was some discussion by the Council members but this discussion did not substantiate any use outside the southwest section of Unit 12); Record Tab 22, 919-27 (Southcentral Transcript at 124-132)(The only discussion of the C&T factors was in the staff report provided by the Office of  Subsistence management; this report essentially mirrored the report provided to the Board demonstrating a history of use only in the southwest section of  Unit 12).

unit.  At most, as indicated in the State's RFR, if the area of use is expanded include

logical geographic boundaries, the data could support a customary and traditional use

determination for 2,500 square miles, or 25 percent of Unit 12.[79]  The eight regulatory

factors for making a customary and traditional determination were not properly applied

because the Board made a customary and traditional use determination for the entire

10,000 square mile unit, despite the large size of the Unit, despite the fact that the record

demonstrated a history of use in only the southwest portion of the unit, and despite

requests from the State to limit any finding to areas where a pattern of use was shown.

The Board did not apply the regulatory factors to all of Unit 12, but instead made a

determination simply because uses extended into small portions of previously established

C&T areas for other communities.[80]

The State does not contest that the Board could reasonably have expanded

its customary and traditional use determination to include the area described in the State's

RFR.  However, the record completely fails to show application of the regulatory factors

for making a customary and traditional use determination for the remaining 7,500 square

miles of Unit 12, and the Board could not have reasonably made such a determination

based on the record before it.

---

[79]     *See* Record Tab 41, 2513, 2523-25 (State's RFR at 4, Attachments 1-3).

[80]     As noted above, these C&T areas do not even correspond fully with harvest
regulation boundaries.  *See supra* note 73; *compare* 50 C.F.R. § 100.24(a)(1) *and* 50
C.F.R. § 100.26(n)(12)*; see also* Record Tab 15, 464 (Eastern Interior Transcript at
70)(Statement of Ms. Cellarius).

**B.    The Board's Adoption of a Customary and Traditional Use Determination for Moose for Residents of Chistochina in all of Unit 12, When the Record Provided Substantial Evidence of Past Use in Only a Small Portion of the Unit, is Inconsistent with ANILCA.**

**1.    The regulations are inconsistent with ANILCA's definition of "subsistence uses" because they authorize a subsistence priority for hunting that is not customary or traditional.**

The customary and traditional use determination for Chistochina residents for moose in all of Unit 12 is inconsistent with the provisions of Section 803 of ANILCA, which authorizes only subsistence uses that are customary and traditional.  Section 803 of ANILCA defines "subsistence uses" as follows:

> As used in this act, the term "subsistence uses" means the <u>customary and traditional uses</u> by rural Alaska residents of wild, renewable resources for direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation; for the making and selling of handicraft articles out of nonedible byproducts of fish and wildlife resources taken for personal or family consumption; for barter, or sharing for personal or family consumption; and for customary trade.

16 U.S.C. § 3113 (emphasis added).  To be a valid "subsistence use" under this section, any hunting allowed must be "customary and traditional."[81]  As shown above, the Board did not have substantial evidence before it that moose hunting in all of Unit 12 was customary and traditional for residents of Chistochina, and based on the record, hunting

//

//

---

[81]    The term "customary and traditional uses" is not defined in statute but as shown above has been defined in regulation.  *See supra* section IV.A.1.; 50 C.F.R. 100.4.

for moose was not "customary and traditional" in more than 75 percent or 7,500 square miles of Unit 12.[82]

"[R]egulations, in order to be valid, must be consistent with the statute under which they are promulgated."[83]   ANILCA authorizes only "subsistence uses," which by statutory definition must be "customary and traditional uses."[84]   ANILCA's provisions establishing a federal priority for "subsistence uses" should be narrowly construed because they constitute a federal encroachment on a basic aspect of state sovereignty, a state's authority over management of fish and game within its borders. "[I]f Congress intends to alter the usual constitutional balance between the states and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute."[85]   Accordingly, courts will not construe a statute to alter the federal balance unless that result is unmistakably clear in the language of the statute.[86] ANILCA's subsistence provisions involve the balance of federal power because management of fish and wildlife within its borders is "peculiarly within [a state's] police powers." [87]   The Ninth Circuit has acknowledged that ANILCA only authorizes

---

[82]     *See* supra section IV.A.1; *compare* Record Tab 41, 2523-25 (RFR attachments describing and mapping areas of use) *and* Record Tab 32, 1684 (Meeting materials Map 2 showing Ahtna historical and cultural sites).

[83]     *United States v. Larionoff*, 431 U.S. 864, 873, 97 S.Ct. 2150, 2156 (1977).

[84]     16 U.S.C. § 3113.

[85]     *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).

[86]     *Vermont Agency of Natural Resources v. United States*, 529 U.S. 765, 768, 120 S.Ct. 1858, 1870 (2000).

[87]     *Baldwin v. Fish and Game Comm'n of Montana*, 436 U.S. 371, 391 (1978).

"customary and traditional" subsistence uses on federal public lands in Alaska.[88]  While Congress may have intended to alter the balance between the State and Federal government with regard to "subsistence uses," there is no "unmistakably clear language" extending this alteration to allow the Federal Subsistence Board to provide a priority for activities that do not fall within ANILCA's statutory definition of "subsistence uses."

There is no substantial evidence in the record of the Board that could reasonably demonstrate that moose hunting by residents of Chistochina within all of Unit 12 is "customary and traditional."  Thus the Board's actions created a subsistence preference for uses that do not fall within ANILCA's definition of "subsistence uses." By doing so, the Board not only exceeded its statutory authority, but infringed on a basic aspect of state sovereignty.  The evidence in the record showed use of only a small portion of Unit 12, and regulatory action extending the C&T determination beyond the logical geographic boundaries of the area in which use was shown is inconsistent with the plain meaning of ANILCA which provides a priority only for "subsistence uses" that by definition must be "customary and traditional."[89]

2.    **The regulations are inconsistent with ANILCA's prohibition on unnecessary restriction of nonsubsistence uses.**

In adopting the customary and traditional use determination for moose for Chistochina residents in all of Unit 12, the Board violated its duty to prevent unnecessary

---

[88]    *United States v. Alexander*, 938 F.2d 942, 948 (9th Cir. 1991).

[89]    *See* 16 U.S.C. § 3113.

restrictions on nonsubsistence uses.  Section 815 of ANILCA provides:

> Nothing in this subchapter shall be construed as:
>
> . . .
>
> (3) authorizing a restriction on the taking of fish and wildlife for nonsubsistence uses on the public lands (other than national parks and park monuments) unless necessary for the conservation of healthy populations of fish and wildlife, for the reasons set forth in section 3126 of this title, to continue subsistence uses of such populations, or pursuant to other applicable law; . . .

16 U.S.C.A. § 3125(3) (2000).  Adoption of  unnecessary C&T determinations almost immediately causes unnecessary indirect restrictions on nonsubsistence uses since State wildlife managers must account for harvest taken under federal regulations and adjust harvests allowed under State regulations accordingly.[90]  Adoption of unnecessarily expansive C&T determinations can lead to unnecessary direct restrictions as well because increased competition among federally qualified users can result in increased pressure to exclude nonsubsistence use.  The reasoning of the Interagency Staff Committee, accepted by Board, that an unnecessary C&T determination is not a restriction on nonsubsistence use,[91] ignores the clear effect of adoption of a C&T determination, and, contrary to the rules of statutory construction,[92] gives no effect to the prohibition in ANILCA section

---

[90]     *See* Alaska Const. art. VIII, § 4.

[91]     *See* Record Tab 49, 2668 (Threshold Analysis at 5)("A customary and traditional use determination . . . does not allocate resources between subsistence users and other users."); Record Tab 49, 2662 (RFR denial at 2) ("[T]he requester's argument is founded on a misperception of the purpose for and rationale for a C&T use determination.").

[92]     *See Boise Cascade Corp. v EPA,* 942 F.2d 1427, 1432 (9th Cir. 1991)("Under accepted cannons of statutory interpretation, we must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a

815 against restrictions "on the taking of fish and wildlife" unless "necessary" to "continue subsistence uses of such populations."

Although the Board's unsupported customary and traditional use determination may not have imposed additional direct immediate restrictions on taking of fish and wildlife for nonsubsistence use, it can certainly be expected to cause unnecessary restrictions in the future. The Board's action granted an immediate unnecessary additional harvest opportunity to Chistochina residents,[93] and because the moose resource is generally fully allocated, any grant of additional privileges that increases a community's ability to take the resource will necessarily result in decreases in opportunity for individuals from other communities.[94] Such actions also have cumulative effects which could result in unnecessary complete closures of federal lands to non-federally qualified subsistence users.[95]

During Board discussions, the state noted that at least one of the moose populations affected by this proposal, the population on the Tetlin Refuge in Unit 12, "is

---

manner that renders other provisions of the same statute inconsistent, meaningless, or superfluous.")(*citing* Sutherland Stat. Const. §§ 46.05, 46.06 (4th ed. 1984)).

[93]     Preexisting additional federal seasons and relaxed limitations on animals eligible for harvest became applicable with the new C&T determination. *See supra* section II; 50 C.F.R. § 100.26(n)(12).

[94]     State wildlife managers are required to manage on a sustained yield basis under Article VIII Section 4 of the Alaska Constitution.

[95]     *See, e.g.,* Record Tab 35, 2157 (Transcript at 137) (Noting that a similar proposal could be expected from Mentasta Lake). Federal lands are already closed to nonsubsistence users by federal regulations allowing additional and longer seasons for those with federal C&T determinations. *See supra* Section II; *compare* 50 C.F.R. 100.26(n)(12) & 5 AAC 85.045(a)(10).

shaky, at best."[96]  The state pointed out that an increase in the number of federally qualified users would result in increasing pressure to close the lands to non-federally qualified users because the potential for demand to outweigh supply would increase.[97] The state also indicated that increased eligibility had the potential to increase the take of moose in Unit 12, and that cumulative impacts were likely because a similar request could be expected from Mentasta Lake, further increasing the pool of eligible priority users.[98]

      As indicated above, the Board's regulatory action providing a customary and traditional use determination for Chistochina residents in all of Unit 12 allows Chistochina residents to participate in federal subsistence hunts with expanded seasons and reduced harvest restrictions within areas totaling over 7,500 square miles in which they have no demonstrated pattern of use.[99]  These changes can be expected to increase participation, harvest, and competition within the federal subsistence hunts, and result in "increasing pressure to close the lands to non-Federally qualified users."[100]  Restrictive state management actions in the form of shorter seasons and limits on the bulls that can be harvested have already been required in much of Unit 12.[101]  Longer federal hunting seasons and increased harvest of animals not eligible for harvest under state law are likely

---

[96]     Record Tab 35, 2156 (Transcript at 136).
[97]     *Id.*
[98]     *Id.* at 2157.
[99]     *See supra* Section II.
[100]     Record Tab 35, 2156-57 (Transcript at 136-137).
[101]     *See* 5 AAC 85.045(10); Record Tab 41, 2521 (State's RFR at 12).

to require adjustment of state seasons and harvest restrictions, and are likely to lead to further restrictions on federal lands as well.[102]

The state raised concerns about the increasing competition and likelihood of future restrictions before the Board,[103] but the Board still failed to limit its customary and traditional use determination to areas with a demonstrated pattern of use. Instead, the Board followed advisory council recommendations that were not supported by substantial evidence and an unsupported and legally irrelevant statement from federal staff that "no additional benefit to management occurs from creating new portions of a unit for customary and traditional findings in Unit 12."[104] The interagency reasoning, accepted by the Board, that an unnecessary C&T determination is not a restriction on nonsubsistence use,[105] ignores the clear effect of adoption of a C&T determination. An unnecessary C&T determination creates necessity for restrictions on nonsubsistence uses. An interpretation of ANILCA allowing the Board to make unnecessary C&T determinations because such determinations are not direct restrictions on nonsubsistence uses is inconsistent with the canons of statutory construction requiring interpretation of

---

[102]    *See* Record Tab 41, 2521 (State's RFR at 12); *see also* Alaska Const. art. VIII, § 4.

[103]    *See, e.g.,* Record Tab 35, 2155-57 (Transcript at 135-137).

[104]    Record Tab 35, 2154 (Transcript at 134.)

[105]    *See* Record Tab 49, 2668 (Threshold Analysis at 5)("A customary and traditional use determination . . . does not allocate resources between subsistence users and other users."); Record Tab 49, 2662 (RFR denial at 2) ("[T]he requester's argument is founded on a misperception of the purpose for and rationale for a C&T use determination.").

statutes "as a whole," "making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless, or superfluous"[106] because such an interpretation is inconsistent with the provision of section 815 of ANILCA prohibiting "a restriction on the taking of fish and wildlife" unless "necessary" to "continue subsistence uses of such populations" and would render that provision virtually meaningless.

### C.  The Regulations Are Arbitrary And Capricious.

In order to be valid, regulations must be reasonable, and not arbitrary or capricious.[107]  The object of the final rules is purportedly to provide for customary and traditional subsistence uses, but the record does not demonstrate that the hunting allowed is customary or traditional.  For 75 percent of Unit 12, in area of approximately 7,500 square miles, the record contains no substantial evidence of <u>any</u> use for moose hunting by residents of Chistochina, not to mention use satisfying the regulatory definition of "customary and traditional use"[108] or demonstrating that the eight regulatory factors for making a C&T determination are "generally exhibited."[109]  This logical defect renders the final rule arbitrary and capricious.  With regards to the majority of Unit 12, the agency has entirely failed to consider an important aspect of the problem, i.e. whether there has

---

[106]    *See Boise Cascade Corp. v EPA,* 942 F.2d 1427, 1432 (9th Cir. 199) (*citing* Sutherland Stat. Const. §§ 46.05, 46.06 (4th ed. 1984)).

[107]    *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 822 (U.S. 1971).

[108]    *See* 50 C.F.R. § 100.4.

[109]    *See* 50 C.F.R. § 100.16(b).

been any customary and traditional use, instead basing its decision on factors Congress

did not intend for it to consider, i.e. whether there was any use within previously

established C&T areas of other communities and whether there was "any benefit to

management" from limiting the C&T finding to areas in which there was documented

use.[110]

The effect of the final rule establishing a C&T determination for moose for

Chistochina residents in all of Unit 12 is to provide a federal subsistence priority for

hunting that does not fall within ANILCA's definition of "subsistence uses,"[111] thus

unnecessarily restricting nonsubsistence uses in violation of section 815 of ANILCA.[112]

Congress spoke directly to the question of what activities are subject to a priority under

ANILCA and provided clear direction that activities not fitting that definition are not to

be restricted unless "necessary" to protect the defined uses. The statute is not ambiguous

or silent on these issues. Adoption of a C&T determination providing a preference for

uses that are not "subsistence uses" and thus unnecessarily restricting nonsubsistence uses

is inconsistent with the plain meaning of the statute and fails to give effect to the

unambiguously expressed plain intent of Congress. These violations of clear statutory

direction also render the final rule arbitrary and capricious.

---

[110]    *See,* Record Tab 35, 2154 (Transcript at 134).
[111]    *See* 16 U.S.C. § 3113 (ANILCA § 803).
[112]    *See* 16 U.S.C. § 3125.

The final rule establishing a C&T determination for moose for residents of Chistochina in all of Unit 12 is arbitrary and capricious because it was adopted in violation of the Board's regulatory definitions and procedures, provides a preference for uses not within ANILCA's definition of "subsistence uses," and, because the effect of the regulation violates the clear statutory intent of Congress to prohibit unnecessary restriction of nonsubsistence uses.

## V.  CONCLUSION

For the foregoing reasons, Plaintiff requests summary judgment invalidating the C&T finding for moose for residents of Chistochina published at 70 Fed. Reg. 36268, 36274.[113]  The Board's record demonstrates C&T use by residents of Chistochina for only a small portion of Unit 12.  The Federal Subsistence Board acted arbitrarily and capriciously and in violation of its statutes and regulations when it made a customary and traditional use determination for all of Unit 12 based on a record that demonstrated use of only a small portion of the unit.[114]

---

[113]    Record Tab 39, 2287.

[114]    The State does not dispute that a broader C&T determination than that applicable under the prior regulations would be appropriate, only that the C&T determination should be limited to areas in which the record demonstrates substantial evidence of customary and traditional use by residents of Chistochina.  As an alternative to invalidating the entire regulation, the Court could issue an order invalidating only those portions of the regulation that provide a C&T determination for moose for residents of Chistochina in those portions of Game Management Unit 12 that do not fall within the drainage of the Nabesna River upstream from the mouth of Lick Creek, and the area south of and including the Pickerel Lake Winter Trail from Lick Creek to the Chisana River.

RESPECTFULLY SUBMITTED this 6th day of October, 2006.

DAVID W. MÁRQUEZ
ATTORNEY GENERAL


By:    s/Steven A. Daugherty
       Steven A. Daugherty
       Assistant Attorney General
       Alaska Bar No. 9406032
       1031 W. 4th Avenue, Suite 200
       Anchorage, Alaska 99501
       Ph: (907) 269-5232
       Fax: (907) 279-2834
       Email:steven_daugherty@law.state.ak.us

       Counsel for Plaintiff State of Alaska

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 6, 2006, a copy of the foregoing **Memorandum in Support of Plaintiff's Motion for Summary Judgment** was served electronically on

    Dean Dunsmore (dean.dunsmore@usdoj.gov)
    Heather Kendall Miller (kendall@narf.org)


s/ Steven A. Daugherty