IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| STATE OF ALASKA,<br><br>        Plaintiff,<br><br>v.<br><br>MICHAEL FLEAGLE Chairman,<br>FEDERAL SUBSISTENCE BOARD,<br>DIRK KEMPTHORNE,<br>Secretary of the Interior,<br>MIKE JOHANNS, Secretary of the U.S.<br>Department of Agriculture,<br>[each in their official capacity]<br><br>        Defendants. | Case No. 3:06-cv-00107-HRH |

**Affidavit of Matthew H. Robus**

1.    Matthew H. Robus, under oath, states as follows: I am the Director of the Division of Wildlife Conservation, Alaska Department of Fish and Game and have held that position since February 2003. Prior to that time, I was the Division's Deputy Director, beginning in February 1999. I have a Bachelor's Degree in Wildlife Management and hold professional certification from the Wildlife Society as a wildlife biologist. I have been employed as a professional wildlife biologist for over 29 years, and have been employed by the Alaska Department of Fish and Game for 25 years.

2.    In my capacities as Deputy Director and Director, I have worked and continue to work closely with the Alaska Board of Game; I attend nearly all meetings of the Board of Game and serve as the primary contact between the Alaska Board of Game and the Department of Fish and Game.

Exhibit C
Page 1 of 14

3. I supervise the Division of Wildlife Conservation staff who monitor wildlife populations and hunting activities in the State of Alaska and make regulatory recommendations to the Alaska Board of Game and develop reports for the Alaska Board of Game concerning the biological status of wildlife populations and hunt participation and harvest rates.

4. I also supervise Division of Wildlife Conservation staff who work with the Alaska Department of Fish and Game's Federal Liaison team to develop regulatory recommendations and comments on regulatory proposals before the Federal Subsistence Board.

5. I also work closely with the Department of Public Safety, particularly the Alaska Bureau of Wildlife Enforcement, to ensure that regulations are reasonable and enforceable in the field. Enforceability of regulatory restrictions is one basic recognized principles of fish and wildlife management. In order for a regulatory program to succeed, particularly in a state as large as Alaska where the enforcement resources are spread very thinly, it must be reasonable enough and enforceable enough to ensure a high degree of compliance. Under AS 16.05.920(a)(2006), taking and possession of wildlife is prohibited except as specifically permitted by state statute or state regulation; violations are punishable as misdemeanors under AS 16.05.925 and restitution to the State may also be required.

6. The Alaska Department of Fish and Game and the Alaska Board of Game are required to manage Alaska's wildlife populations for sustained yield under the Alaska Constitution and enabling statutes. Under AS 16.05.255 and a few other statutes, the Board of Game is authorized to adopt regulations governing almost every aspect of the human use of, and effects upon, Alaska's game populations. However, under AS 16.05.241, the Board's powers are limited to regulation making, and it may not exercise any administrative, budgeting, or fiscal powers. On the other hand, the Commissioner of Fish and Game has broad authority to manage

*State v. Fleagle*
Case No. 3:06-cv-00107-HRH
Affidavit of Matthew H. Robus

Page 2 of 10

**Exhibit C**
**Page 2 of 14**

Alaska's game resources, engage in planning efforts, conduct research and generally exercise all of the powers that the Board does not have. AS 16.05.020 and .050. Practically speaking, these divisions of authority result in a divided workload. The Board, acting as a body, adopts rules governing the uses of Alaska's game, while the Department, under its separate authorities, carries out all of the day-to-day tasks involved in managing those game resources. Sometimes the Department must seek rule changes from the Board in order to meet the Department's management goals and obligations. Likewise, the Board frequently requests that the Department apply its expertise to the Board's rulemaking efforts, through technical input, drafting assistance, research, and in other areas. However, each entity is independent of the other, with separate statutory authorities and missions. The Alaska Department of Fish and Game and the Alaska Board of Game work closely together to carry out their constitutional and statutory responsibilities to provide for sustained yield management of Alaska's wildlife resources.

7. Carrying out the constitutional and statutory responsibilities of the Alaska Board of Game and the Alaska Department of Fish and Game is complicated by the dual management system put in place following the decision of the Alaska Supreme Court in *McDowell v State*. Under this system, the federal government, through the Federal Subsistence Board, manages the taking of wildlife for subsistence uses by federally qualified rural residents on the federal public lands, while the Alaska Board of Game and the Alaska Department of Fish and Game continue to manage wildlife populations on all lands. Management is complicated because the same wildlife populations are subject to harvest under two different sets of rules, one federal and one state, often with different harvest areas, harvest limits, size limitations, sex limitations, and reporting requirements. Every increase in the number of rural residents with a positive C&T

*State v. Fleagle*
Case No. 3:06-cv-00107-HRH
Affidavit of Matthew H. Robus

*Page* 3 of 10
**Exhibit C**
**Page 3 of 14**

determination for an area for which there are federal regulations different than state regulations makes management more difficult; even relatively small increases have cumulative effects.

9. Enforcement of state regulations adopted to carry out the constitutional and statutory responsibilities of the Alaska Board of Game and the Alaska Department of Fish and Game is also complicated by the dual management system because a person who is a federally qualified rural resident may take wildlife under federal regulations that would be prohibited under state regulations; thus a violation may not be proven by simple possession of wildlife whose take would be prohibited under state law. Under the dual management system, it becomes necessary to determine whether a hunter taking or possessing wildlife prohibited under state law may legally take or possess the wildlife under federal law; determining whether the wildlife may be taken under federal law often requires establishing both the place of residence of the person responsible for the taking and the exact place where the wildlife was taken. Determination of the exact place of taking is often not practicable, rendering regulations applicable to state lands virtually unenforceable with regards to federally qualified subsistence users in areas of intermixed state and federal lands. Even in the unlikely event that the place of taking can be located, it is often difficult to determine whether the taking was on federal public lands because these lands are not fenced and in most cases do not have marked boundaries of any sort. Enforcement and compliance with state law is also complicated even in areas where there are no known federal lands by the fact that there are a number of unresolved legal questions regarding whether certain lands, including Native allotments and the surface of frozen water bodies in which the federal government claims to hold a Federal Reserved Water Right are federal public lands. There are Native allotments scattered throughout Unit 12, including the Northwest portion of Unit 12. Every increase in the number of rural residents with a positive C&T

*State v. Fleagle*
Case No. 3:06-cv-00107-HRH
Affidavit of Matthew H. Robus

Page 4 of 10
**Exhibit C**
**Page 4 of 14**

determination for an area for which there are federal regulations different than state regulations makes enforcement more difficult; even relatively small increases have cumulative effects.

10. The Federal Subsistence Board's positive C&T determination for moose for Chistochina residents in all of Unit 12 had the immediate effect of pre-empting state law by making Chistochina residents "federally qualified subsistence users" in all of Unit 12. It immediately made Chistochina eligible to participate in four new federal hunts in violation of state regulations and expanded the area where they could participate in two other federal hunts in violation of state regulations. *Compare* Attachment 1 (Federal Subsistence Hunt Boundaries 2005 – 2006 GMU 12 (illustrating hunt boundaries in 50 C.F.R. § 100.26(n)(12)(2005)) *and* Attachment 2 (State General Hunt Boundaries 2005 – 2006 (illustrating boundaries in 5 AAC 85.045(10)(2005)(Register 172).

11. Within the Tetlin National Wildlife Refuge (NWR) and on those lands within the Wrangell-St. Elias National Preserve north and east of a line formed by the Pickerel Lake Winter Trail from the Canadian Border to the southern boundary of the Tetlin NWR, *see* Attachment 1, (blue and yellow area labeled "1" with federal public lands crosshatched), Chistochina residents immediately became eligible for three new federal hunts during which the taking of any antlered bull was permissible. Two of these hunts coincided with similar state hunts, however, the third hunt, from November 20 to November 30, allowed harvest when the state season was completely closed. *See* Attachment 2 (red shaded area labeled "3").

12. Within the portion East of the Nabesna River and east of the Nabesna Glacier, and south of the Winter Trail running south-east from Pickerel Lake to the Canadian Border (*See* Attachment 1, green and yellow crosshatched area labeled "2"), Chistochina residents immediately became eligible for a new federal hunt during which the taking of any antlered bull

*State v. Fleagle*  
Case No. 3:06-cv-00107-HRH  
Affidavit of Matthew H. Robus  

*Page* 5 of 10  
**Exhibit C**  
**Page 5 of 14**

was permissible. Part of this hunt occurred from August 24 through August 31 when the state season was completely closed, and the hunt continued over the time period from September 1 to September 30 coinciding with a state hunt during which harvest was limited to a bull with 50-inch antlers, or four or more brow tines on at least one side. *See* Attachment 2 (green shaded area labeled "2").

13. Within the remainder of Unit 12, *see* Attachment 1 (red shaded area labeled "3"), Chistochina residents immediately became eligible for an expanded hunt in two seasons (on federal lands north of the solid red line depicting the upper boundary of the old C&T determination on Attachment 1). During the first part of the first season, August 15 through August 23, taking of a bull with spike-fork antlers was authorized under the federal regulations while the state season was closed. *See* Attachment 2 (red and blue shaded areas labeled "1" and "3"). At the beginning and end of the second season, September 1 through September 7, and September 18 through September 30, taking of an antlered bull was authorized under the federal regulations while the state season was closed. Further, in a portion of the northwest section of Unit 12, on any federal public lands that may be present, the federal regulation allowed the taking of an antlered bull in an area where state regulations allowed only the taking of a bull with spike-fork antlers, 50-inch antlers, or antlers with four or more brow tines on at least one side. *See* Attachment 2 (blue shaded area labeled "1").

14. During the 2006 – 2007 season, federal and state regulations changed slightly; Chistochina residents remain eligible to participate in four federal hunts where they are allowed to take moose in violation of state law and two federal priority hunts which currently do not conflict with state hunts. *Compare* Attachment 3 (Federal Subsistence Hunt Boundaries 2006 – 2007 GMU 12 (illustrating hunt boundaries in 50 C.F.R. § 100.26(n)(12)(2006)) *and*

*State v. Fleagle*
Case No. 3:06-cv-00107-HRH
Affidavit of Matthew H. Robus

*Page* 6 of 10

**Exhibit C**
**Page 6 of 14**

Attachment 4 (State General Hunt Boundaries 2006 – 2007 (illustrating boundaries in 5 AAC 85.045(10)(2006)(Register 178).

15.     Within the Tetlin NWR and on those lands within the Wrangell-St. Elias National Preserve north and east of a line formed by the Pickerel Lake Winter Trail from the Canadian Border to the southern boundary of the Tetlin NWR, *see* Attachment 3, (blue and yellow area labeled "1" with federal public lands crosshatched), Chistochina residents remain eligible for three federal hunts during which the taking of any antlered bull was permissible. Two of these hunts coincide with similar state hunts however, the third hunt, from November 20 to November 30, allows harvest when the state season is completely closed. *See* Attachment 4 (red and blue shaded areas labeled "1" and "3").

16.     Within the portion east of the Nabesna River and east of the Nabesna Glacier, and south of the Winter Trail running south-east from Pickerel Lake to the Canadian Border (*See* Attachment 3, green and yellow crosshatched area labeled "2"), Chistochina residents remain eligible for a new federal hunt during which the taking of any antlered bull is permissible. Part of this hunt occurs from August 24 through August 31 when the state season is completely closed, and the hunt continues over the time period from September 1 to September 30 coinciding with a state hunt during which harvest is limited to a bull with 50-inch antlers or four or more brow tines on at least one side. *See* Attachment 4 (green shaded area labeled "2").

17.     Within the remainder of Unit 12 (*See* Attachment 3, red area labeled "3"), Chistochina residents remain eligible for an expanded hunt in two seasons (on federal lands above the solid red line depicting the upper boundary of the old C&T determination on Attachment 3). During the first part of the first season, August 15 through August 23, taking of a bull with spike-fork antlers is authorized under the federal regulations while the state season is

*State v. Fleagle*
Case No. 3:06-cv-00107-HRH
Affidavit of Matthew H. Robus

Page 7 of 10
**Exhibit C**
**Page 7 of 14**

closed. *See* Attachment 4 (red and blue shaded areas labeled "1" and "3"). During the first part of the second season, September 1 through September 7, taking of an antlered bull is authorized under the federal regulations while the state season is closed. Further, in a portion of the northwest section of Unit 12, on any federal public lands that may be present, the federal regulation allows the taking of an antlered bull in an area where state regulations allow only the taking of a bull with spike-fork antlers, 50-inch antlers, or antlers with four or more brow tines on at least one side (*See* Attachment 4, State General Hunt Boundaries, blue shaded area labeled "1").

18.  The State receives information regarding participation and take of moose in state hunts in Unit 12 directly; the State must request information from federal land managers regarding participation and take of moose in federal hunts in Unit 12.

19.  The State often experiences delay in receipt of data regarding participation and take in federal hunts, and when the data is received it is not always immediately useable because it is not always in a format compatible with the state database.

20.  The State has encountered difficulty and delays in obtaining federal data regarding participation and take in federal hunts in Unit 12.

21.  The expansion of Chistochina's federal C&T determination to include all of Unit 12, instead of a small portion of the Unit, has increased the workload of my staff and made management more difficult. Cumulative effects of such determinations are likely to cause significant impacts on management.

22.  State moose hunting regulations, adopted by the Board of Game for Unit 12 have become more restrictive since the adoption of the Federal Subsistence Board's C&T determination for Chistochina residents in Unit 12. *Compare* Attachment 2 *and* Attachment 4

*State v. Fleagle*
Case No. 3:06-cv-00107-HRH
Affidavit of Matthew H. Robus

*Page* 8 of 10

**Exhibit C**
**Page 8 of 14**

(blue shaded area in which a spike-fork, 50-inch, or four brow tine requirement applies has expanded)(illustrating changes between 5 AAC 85.045(10)(2005) *and* 5 AAC 85.045(10)(2006).

23.     The expansion of Chistochina's federal C&T determination to include all of Unit 12, instead of a small portion of the Unit, makes the depletion of the moose resource and the need for the my staff to recommend additional restrictions on other users more likely; cumulative impacts of such decisions are likely to cause restrictions on other users.

24.     The expansion of Chistochina's federal C&T determination to include all of Unit 12, instead of a small portion of the Unit, makes the depletion of the moose resource and the need for the Board of Game to adopt additional restrictions on other users more likely; cumulative impacts of such decisions are likely to cause restrictions on other users.

25.     The ability of the Board of Game and the Alaska Department of Fish and Game to adapt rapidly to changes in the status of wildlife populations is hampered by the dual management system because regulations and emergency regulations adopted by the Board or emergency orders adopted by the Department do not limit the activities of federally qualified users on federal lands. Federal responses to state changes are not always rapid. Further, the Federal Subsistence Board does not always follow the State lead and may even expand federal seasons or bag limits in response to decreases in opportunity caused by changes to state seasons. Every increase in the number of federally qualified users, made through granting additional positive customary and traditional use determinations, makes it more difficult for the Alaska Board of Game to manage Alaska's wildlife populations, even small increases have cumulative effects.

26.     As shown above and as illustrated by Attachments 1-4, the State's interests in management of its moose resource and enforcement of its hunting regulations has been and

*State v. Fleagle*
Case No. 3:06-cv-00107-HRH
Affidavit of Matthew H. Robus

Page 9 of 10
**Exhibit C**
**Page 9 of 14**

continues to be harmed by the unnecessarily overbroad Chistochina C&T determination which allows Chistochina residents to take moose at times and places when take is prohibited under state law and also allows Chistochina residents to take moose that do not fall within size ranges eligible for harvest under state law.

Further, affiant sayeth naught.

_____
Matthew H. Robus

SUBSCRIBED AND SWORN TO before me this 12 day of March 2007.



_____
Notary Public, State of Alaska
My commission expires with office

State v. Fleagle
Case No. 3:06-cv-00107-HRH
Affidavit of Matthew H. Robus

Page 10 of 10

**Exhibit C**
**Page 10 of 14**