TALIS J. COLBERG
ATTORNEY GENERAL

Steven A. Daugherty
Assistant Attorney General
1031 W. 4th Avenue, Suite 200
Anchorage, Alaska 99501
Ph: (907) 269-5232
Fax: (907) 279-2834
Email: steven_daugherty@law.state.ak.us

Counsel for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| STATE OF ALASKA, | ) | |
| | ) | Case No. 3:06-cv-00107-HRH |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL FLEAGLE Chairman, | ) | |
| FEDERAL SUBSISTENCE BOARD, | ) | |
| et. al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**[PROPOSED]***
**PLAINTIFF'S REPLY TO DEFENDANTS' BRIEFS RESPONDING
TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**\*** Exhibit to Unopposed Motion for Leave to File Over Length Reply.

# TABLE OF CONTENTS

I.  THE STATE'S POSITION...........................................................................................1

II.  THE STATE HAS CONSTITUTIONAL AND PRUDENTIAL
    STANDING TO CHALLENGE THE BOARD'S C&T
    DETERMINATION. ...........................................................................................2

    A.  Article III Standing Requires Only Three Elements:  Injury, a Causal
        Connection, and Redressiblity. ....................................................................3

        1.  The State's sovereign and proprietary interests in the enforcement of its
            laws, its wildlife, and wildlife management have been injured, and
            continue to be injured, by the Board's C&T determination granting
            Chistochina residents a right to take moose in violation of state laws
            prohibiting such take......................................................................................3

        2.  The Board's C&T determination has caused and continues to cause
            injury to the State's sovereign and proprietary interests in wildlife
            management and criminal enforcement...........................................................7

        3.  The injury to the State caused by the unsupported positive C&T
            determination would be redressed by a favorable decision. ...................8

    B.  The State Has Prudential Standing Because Its Injuries Are Within The
        Zone of Interests Protected or Regulated by ANILCA and the
        Administrative Procedure Act (APA). .........................................................9

    C.  Because the State of Alaska Is Seeking to Protect Its Own Sovereign and
        Proprietary Interests, any Prohibition on *Parens Pateriae* Suits against the
        Federal Government is Inapplicable. ........................................................11

III.  NO DEFERENCE IS DUE TO UNREASONABLE AGENCY
     INTERPRETATIONS OR TO AGENCY INTERPRETATIONS THAT
     ARE INCONSISTENT WITH CONTROLLING STATUTES OR
     REGULATIONS...........................................................................................11

IV.  THE POSITIVE C&T DETERMINATION ALLOWING CHISTOCHINA
     RESIDENTS TO HARVEST MOOSE IN ALL OF UNIT 12 WAS
     UNSUPPORTED AND CONTRARY TO LAW........................................13

    A.  Taking From a Customary and Traditional Harvest Area and Population
        Are Necessary Components of a C&T Determination. .............................13

    B.  The Chistochina C&T Determination Being Challenged Is Not Supported
        by the Board Record. .................................................................................20

C.  The Defendants May Not Blindly Defer to Regional Advisory Council Recommendations that Are Not Supported by the Record before the Board. .................................................................................................... 23

V.  CONCLUSION ................................................................................................ 28

Plaintiff, State of Alaska, hereby replies to Defendants' Briefs (Docket Nos. 32 and 33) opposing the State's Motion for Summary Judgment (Docket Nos. 23 and 24).

## I.    THE STATE'S POSITION.

Plaintiff, State of Alaska, challenges an administrative determination of the Federal Subsistence Board ("Board") expanding a customary and traditional federal subsistence priority harvest area determination ("C&T determination") for moose for the community of Chistochina to include all 10,000 square miles of State Game Management Unit 12 ("Unit 12") based on an administrative record that demonstrates actual use of only a small portion of the unit,[1] totaling 206 square miles.[2]   As was previously shown, even if all areas identified in the record as older historical sites to which Chistochina might be linked were added to the area where there is a record of actual use,[3]  the total area logically encompassed would be only 2,500 square miles.[4] Instead, the Board made its determination covering the entire Unit 12, over the objection of the State,[5] despite the lack of evidence of use, and despite the fact that the Defendants assert in this proceeding that federal public lands do not even exist in much of Unit 12.[6]

---

[1]    The maps attached hereto Exhibits A and B are cleaner versions of the same maps found at R. Tab 41, 2524-25 and show the areas of actual use (in Units 12 and 13) in crosshatch marking.

[2]    *See* R. Tab 41, 2523.

[3]    *See* R. Tab 34, 1684 (WP05-21 Map 2 Ahtna Historical and Cultural Sites).

[4]    *See* Exs. A and B (area shaded light blue).  Note that the Board determined that these maps and other information presented in the State's Request for Reconsideration did not represent new information, but a "repackaging of information that the Board had before it." R. Tab 49, 2622.

[5]    Defendants, after conceding that the State objected to a new expanded C&T determination extending beyond the areas where documentation showed actual use by the residents of Chistochina (Defs.' Br. at 7), nevertheless suggest that the State objected only to a small portion of that expansion.  *Id.* at 8-9, 32-33.  That is incorrect.  The State clearly asserted that subsistence eligibility "should be extended only to those parts of the unit where the community has established a pattern of customary and traditional use."  R. Tab 34, 1856; R. Tab 35, 2155.

[6]    *See* Defs.' Br. at 8 fns. 10-12 and accomp. text.  While Defendants argue that their expanded C&T determination only applies to federal public lands within Unit 12, *id.*, they failed to draw their C&T boundaries in a manner excluding the large areas within Unit 12 they claim are not federal lands; instead leaving it to the State and users to dispute with one another and the federal

The Board's unreasonable, unsupported, and excessively overbroad C&T determination granting Chistochina residents a federal right to take moose on federal lands in all of Unit 12 in violation of State laws of general applicability regulating the harvest of moose, was arbitrary and capricious. It had the immediate effect of damaging the State's sovereign interests in the enforcement of its civil and criminal codes and in its sovereign and proprietary interests in wildlife management.

## II.   THE STATE HAS CONSTITUTIONAL AND PRUDENTIAL STANDING TO CHALLENGE THE BOARD'S C&T DETERMINATION.

As a result of the C&T determination being challenged, the State of Alaska has suffered injury to its sovereign interests in the enforcement of its civil and criminal codes and in its sovereign and proprietary interests in wildlife management and is likely to suffer further injury by being required to restrict other uses of moose in order to ensure compliance with Alaska's constitutional sustained yield mandate.[7] These injuries are directly traceable to the unlawful conduct of the defendant Board and will be redressed by the relief requested. The State's interests in sound wildlife management and in preventing unnecessary restrictions on

---

government where the federal regulations apply and where they do not. If federal lands are as easily defined as the Defendants now suggest (such as through their new Exhibit 2), then the federal Defendants could and should have drawn those boundaries and limited their C&T determination to the lands within those boundaries at the time they made that determination, rather than casting a broad net over all of Unit 12. Defendants' assertions also ignore the unresolved status of certain "lands", including both Native allotments and water bodies (liquid and frozen) in which the federal government claims to hold a federal reserved water right, which have not been resolved by rule or by a court. *See* Ex. C at ¶ 9 (Aff. of Mathew H. Robus); Ex. D at ¶ 8 (Aff. of Lt. Gary Folger); *see also* 50 C.F.R. § 100.3 (applicability and scope) *and* 50 C.F.R. § 100.4 (definition of "public lands"). The injury to Plaintiff from the overbroad C&T determination would be greatly reduced, although not eliminated, if the Court were to enter an order enforcing Defendants' representation (Defs.' Br. p. 8 n. 10) that the only federal public lands in Unit 12 to which the C&T determination might apply are those areas designated in Defendants' Ex. 2.

[7]   *See* Ex. C at ¶¶ 5-26 (Robus Aff.); Ex. D at ¶¶ 5-17 (Folger Aff.); Compl. at ¶¶ 2, 54-60 (Docket No. 1); Alaska Const. art. VIII, § 4.

nonsubsistence use are also within the "zone of interests" of the Alaska National Interest Lands Conservation Act ("ANILCA").  Accordingly, this Court has constitutional and prudential jurisdiction over this matter.

A.    **Article III Standing Requires Only Three Elements:  Injury, a Causal Connection, and Redressiblity.**

1.    **The State's sovereign and proprietary interests in the enforcement of its laws, its wildlife, and wildlife management have been injured, and continue to be injured, by the Board's C&T determination granting Chistochina residents a right to take moose in violation of state laws prohibiting such take.**

"A state has been injured when the action it seeks to challenge injures one of the state's sovereign interests."[8]  The power to create and enforce legal code, both civil and criminal, has been recognized as a "sovereign interest."[9]  The power to regulate the taking of fish and wildlife has also been recognized as a "sovereign interest,"[10] falling within a state's police powers.[11]  The Alaska Supreme Court has specifically recognized that regulation of hunting and fishing is

---

[8]    *Maine v. Norton*, 257 F.Supp.2d 357, 373-74 (D. Maine 2003) (finding standing in summary judgment action taking judicial notice of state's sovereign interests in wildlife management and enforcement of its legal codes), *citing Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601 (1982).

[9]    *Alfred L. Snapp & Son, Inc.*, 458 U.S at 601; *Maine v. Norton*, 257 F.Supp.2d at  374 (taking judicial notice, in a summary judgment context, of the fact that a federal Endangered Species Act (ESA) listing of salmon would injure Maine "by interfering with its sovereign interests in managing its own natural resources and enacting and enforcing its own legal code"); *Alaska v. U.S. Dept. of Transportation*, 868 F.2d 441, 443-45 (D.C. Cir. 1989) (holding that federal order preempting state advertising regulations constituted injury to states and, after finding standing, invalidating that order for failure to follow required notice-and-comment procedures).

[10]    *Alliance Against IFQs v. Brown,*  84 F.3d 343, 351 (9th Cir. 1996)(noting that the State of Alaska, not individual fishermen, would be the party affronted by federal fishery regulations interfering with its sovereign interest in the power to regulate fisheries); *Minnesota v. Mille Lacs Band of Chippewa Indians*, 562 U.S. 172, 204 (1999)(recognizing that even treaty-based usufructuary rights must yield to "reasonable and necessary nondiscriminatory [state] regulations . . . in the interest of conservation"); *Maine v. Norton*, *infra* note 9.

within "the historic police powers of states."[12]  A state has "a judicially cognizable interest in the preservation of its own sovereignty" and standing to challenge actions alleged to interfere with and diminish that sovereignty.[13]

The special interest Alaska has in regulating and preserving wildlife for its citizens is recognized in ANILCA,[14] and similar interests have been recently reaffirmed generally for all States in other federal law.[15]  In a relatively recent decision, the Alaska Supreme Court has concluded that, although the State does not own wildlife "in precisely the same way that it owns ordinary property," fish and wildlife are "assets" of the state and, specifically, that any decline in the State's moose population "would be as significant to the state as the loss of any other asset."[16]  Thus, the State has proprietary and sovereign interests in the management of its moose populations which it sufficiently alleges are harmed by the Board's preemption of state management authority, making depletion of the moose resource and the need for additional restrictions on other users more likely.[17]

The framers of Alaska's Constitution included several provisions[18] reflecting the intent to

---

[11]   *Clajon Production Corp. v. Petera,* 854 F.Supp. 843, 851 (D. Wy. 1994) ("[E]ven though claims of ownership may be 'pure fantasy,' the state's ability to exercise its police powers to regulate this resource is unaffected").

[12]   *Totemoff  v. State*, 905 P.2d 954, 958 (Alaska 1995).

[13]   *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 50 n. 17 (1986) (agreeing with district court finding that state had standing because it alleged a diminishment of its sovereignty by interference with its employment relations).

[14]   *See, e.g.*, 16 U.S.C. § 3202 (recognizing the continuing responsibility and authority of the State of Alaska for management, including taking, of fish and wildlife on state and federal public lands) and further discussion *infra*.

[15]   *See, e.g., Minnesota v. Hoeven*, 456 F.3d 826, 831 (8th Cir. 2006) (*citing* the Reaffirmation of State Regulation of Resident and Nonresident Hunting and Fishing Act of 2005).

[16]   *Pullen v. Ulmer,* 923 P.2d 54, 59 (Alaska 1996).

[17]   *See, e.g.*, Ex. C at ¶¶ 23-24 (Robus Aff.); Compl. at ¶¶ 2, 53-60 (Docket No. 1).

[18]   *See, e.g.,* Alaska Const. Art. VIII, §§ 2 (legislature to provide for utilization, development and conservation for the maximum benefit of the people), 3 (fish, wildlife, and waters reserved to

"constitutionalize historic common law principles governing the sovereign's authority over management of fish, wildlife and water resources."[19]  The Alaska Supreme Court has held that, although statements regarding state ownership expressed during the State constitutional convention are "technically incorrect" following *Hughes v. Oklahoma*,[20] "the trust responsibility that accompanied state ownership remains."[21]

Alaska carries out its sovereign and proprietary constitutional responsibilities to provide for the utilization, development, conservation, common use, and sustained yield of wildlife resources, through statutory and regulatory provisions governing the taking of wildlife.[22]  In part these codes provide that taking and possession of wildlife, including moose, is prohibited except as specifically permitted by state statute or state regulation.  The Alaska Statutes provide:

> Unless permitted by AS 16.05 - AS 16.40, by AS 41.14, or by regulation adopted under AS 16.05 - AS 16.40 or AS 41.14, a person may not take, possess, transport, sell, offer to sell, purchase, or offer to purchase fish, game, or marine aquatic plants, or any part of fish, game, or aquatic plants, or a nest or egg of fish or game.[23]

Alaska regulations provide:

> Game may not be taken by hunting except as specifically provided in this chapter.[24]

Violations of these provisions are punishable by criminal sanctions and by requirements for

---

people for common use), 4 (fish, wildlife, and other replenishable resources to be maintained on the sustained yield principle).

[19]  *Pullen*, 923 P.2d at 60, *citing Owsichek v. State*, 763 P.2d 488, 495 (Alaska 1988).

[20]  441 U.S. 322, 335-36 (1979) (overruling the state ownership principle expressed in *Geer v. Connecticut*, 161 U.S. 519 (1896), but noting that rule adopted by the Court "makes ample allowance for preserving, in ways not inconsistent with the Commerce Clause, the legitimate state concerns for the conservation and protection of wild animals underlying the 19th century legal fiction of state ownership").

[21]  *Owsichek*, 763 P.2d at 495.

[22]  *See* Ex. C at ¶¶ 5-6 (Robus Aff.); Ex. D at ¶¶ 5-6 (Folger Aff.).

[23]  AS § 16.05.920(a).

[24]  5 AAC § 85.001.

restitution to the State under AS 16.05.925.

Both the State's sovereign and property interests in the management of its wildlife and the State's sovereign interest in enforcement of its criminal code were directly injured by the Board's unsupported C&T determination for moose for Chistochina residents in Unit 12. The Board's C&T determination had immediate effect in 2005, through 50 C.F.R. § 100.26(n)(12);[25] authorizing Chistochina residents to hunt at times when hunting is prohibited under State law[26] and to take moose whose harvest is prohibited under state law,[27] given federal harvest regulations already in effect at the time that positive C&T determination became effective.[28]

The Ninth Circuit recognizes that "a credible threat of harm is sufficient to constitute actual injury for standing purposes."[29] It also recognizes that "plaintiffs need not wait until the natural resources are despoiled before challenging the government action leading to potential

---

[25]  *See* 70 Fed. Reg. 36268, 36295 (2005).

[26]  *Compare* 50 C.F.R. § 100.26(n)(12)(2005) (federal subsistence harvest seasons in various parts of Unit 12 of August 15-28, August 24-28, September 1-15, September 8-17, August 24-September 30,  and November 20-30) *with* 5 AAC § 85.045(a)(10)(2005; Register 172) (State harvest seasons in various parts of Unit 12 limited to August 24-28, September 8-17, and September 1-30.)  *See also* Compl. (Docket No. 1) at ¶¶ 54-56 (explaining preferences given under federal rules); Ex. C at ¶¶ 10-13 (Robus Aff.)(explaining impact of federal regulations in 2005).

[27]  *Compare* 50 C.F.R. § 100.26(n)(12) (2005) *with* 5 AAC § 85.045(a)(10) (2005; Register 172) (federal rules allow take of <u>any antlered bull</u> in the Tetlin National Wildlife Refuge, portions of the Wrangell – St. Elias National Preserve, and in areas south of the winter trail, while state regulations much more restrictively limit harvest to only those moose with <u>spike fork antlers, 50 inch antlers, or 4 brow tines</u>)**; *see also* Ex. C at ¶¶ 10-17 (Robus Aff.)(comparing State and Federal harvest rules).

[28]  Given only minor changes made to the federal harvest regulations for the 2006-07 season, *see* 71 Fed. Reg. 37642, 37671 (2006), those federal regulations continue to allow Chistochina residents to harvest the State resource within Unit 12 at times when State seasons for moose are closed and to harvest moose not eligible for harvest, at any time, under state regulations. *Compare* 50 C.F.R. § 100.26(n)(12)(2006) *with* 5 AAC § 85.045(a)(10)(2006; Register 178); *see also* Ex. C at ¶¶ 10-17 (Robus Aff.)(explaining effect of C&T determination).

[29]  *Central Delta Water Agency v. United States*, 306 F.3d 938, 949 (9th Cir. 2002).

destruction."[30] As has been demonstrated, the Board's unsupported C&T determination for moose for residents of Chistochina constitutes a direct, concrete, and particularized injury, and a continuing threat of future injury, to the State's sovereign and proprietary interests in the management of the State's moose resource and in the adoption and enforcement of the State's criminal code.  The Board's C&T determination has had the effect of preempting state law with regard to hunting moose in Unit 12.  That federal action is also likely to cause further future injury to the State by damaging the moose resource and requiring the State to impose more stringent restrictions on other users who do not have that federal preference in order to ensure compliance with the State's constitutional and statutory management responsibilities.[31]

In addition, the Ninth Circuit has recognized that public agencies have standing to seek judicial review of actions that affect the performance of their duties.[32]  Thus, it is clear that the State of Alaska, which includes and represents the Alaska Department of Fish and Game (ADF&G) and the Alaska Board of Game, the State agencies with affected delegated responsibilities for the conservation and development of Alaska's wildlife resources,[33] has standing to challenge the Board's unsupported C&T determination in this instance.

> **2.    The Board's C&T determination has caused and continues to cause injury to the State's sovereign and proprietary interests in wildlife management and criminal enforcement.**

The causation prong of the standing test requires only that the injury suffered be fairly traceable to the challenged action of the defendant.[34]  In this case, injury to the State's sovereign and proprietary interests in the management of its moose populations and in the criminal

---

[30]  *Id.*
[31]  *See* Ex. C at ¶¶ 23-24 (Robus Aff.); Compl. at ¶¶ 57-60 (Docket No. 1).
[32]  *Central Delta*, 306 F.2d at 950-51.
[33]  *See* AS 16.05.020 (functions of the Commissioner); AS 16.05.221(b) (creation and authority of the Board of Game); AS 16.05.255 (regulatory authority of the Board of Game).

enforcement of its regulations has been directly caused by the Board's unsupported C&T determination.[35]  The Board's determination had the immediate effect of preempting state law by making federal harvest regulations applicable despite conflict with state law.  As shown above, these federal harvest regulations allow the taking of moose at times when such harvest is prohibited under state law and also authorize the taking of moose that do not fall within size ranges eligible for harvest under state law.  This injury is fairly traceable to the Board's unsupported C&T determination and continues to occur under current regulations.

### 3.    The injury to the State caused by the unsupported positive C&T determination would be redressed by a favorable decision.

The redressability prong of the standing test requires only that it is "likely" that the injury suffered "will be redressed by a favorable decision."[36]  In this case, the request for relief in the State's Complaint  asks the Court to set aside and invalidate the portion of the Board's June 22, 2005, rulemaking that expands the customary and traditional harvest determination for Chistochina residents in Unit 12, and to enjoin application of that unsupported expansion of  the C&T determination for Chistochina.[37]  Thus, a favorable decision would redress the injury to the State's sovereign and proprietary interests in the management of the moose resource and in the enforcement of state law by greatly reducing the area in which Chistochina residents can take

---

[34]   *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992).
[35]   Defendants' unsupported arguments that excessive C&T determinations do not impact the State or cause restrictions on other uses ignores, among other things, the following: (1) once a positive C&T determination is made for an area in which there is a federal subsistence hunt allowed there is an immediate priority for taking the limited resource; (2) because the resource is limited and subject to management for maximum sustained yield any increase in take by one group of users will necessitate reductions in take by other users; and (3) that, at the very least, undefined and uncertain federal lands and overlapping areas and regulations result in confusion, disagreements, added expense to the State, and an increased likelihood of management error.
[36]   *Lujan*, 504 U.S. at 561.
[37]   Compl. at 17-18 (Docket No. 1).

moose in violation of state law[38] and by reducing the likelihood that the State will be required to place additional restrictions on other users.

B.    **The State Has Prudential Standing Because Its Injuries Are Within The Zone of Interests Protected or Regulated by ANILCA and the Administrative Procedure Act (APA).**

All that is required for "prudential standing" is for the interest sought to be protected by the plaintiff to "be arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question."[39]  The U. S. Supreme Court has "instructed that the 'zone of interests' test is to be construed generously."[40]  As the Ninth Circuit Court observed in an APA review case applying that standard, the plaintiff need only show that its interests "fall within the 'general policy' of the underlying statute and that interpretation of the statute's provisions could directly affect them."[41]  Therefore, in a suit such as this, where the State is seeking review under the APA of the federal defendants' implementation of ANILCA, the court must look to the substantive provisions of ANILCA to determine whether the State's interests

---

[38]    If the Court grants the full relief requested by the State, the area in Unit 12 in which Chistochina residents can take moose on federal public lands in violation of state law would be reduced by approximately 8,867 square miles, and even if the Court granted only partial relief, allowing the C&T determination to stand within the logical geographic boundaries of actual and historical harvest areas, the area would be reduced by 7,500 square miles. *See* R. Tab 41 at 2523. As previously noted, even where large tracts of federal land are not present, the potential "federal subsistence" defense complicates enforcement of state laws.  *See, e.g.,* discussion at notes 6 and 35 *supra*; Ex. C at ¶ 9 (Robus Aff.); Ex. D at ¶¶ 7-8 (Folger Aff.).   Among other things, the question of whether Native allotments, which are scattered throughout Unit 12 including its northwest portion, are "federal public lands," has still not been resolved by the courts or by rule. *See* discussion and citations at note 6 *supra.*.

[39]    *Bennett v. Spear,* 520 U.S. 154, 175 (1997) (holding that ranch owners and irrigation districts subject to potential harm from operational changes recommended to protect an endangered species had standing to challenge a biological opinion issued under the ESA).

[40]    *See City of Sausalito v. O'Neill,* 386 F.3d 1186, 1200 (9th Cir. 2004), *citing Clarke v. Secs. Indus. Ass'n,* 479 U.S. 388, 399 (1987).

[41]    *City of Sausalito*, 386 F.3d at 1200-05.

fall within the statute's zone of interests.[42]

Under that analysis the State has prudential standing in this case. As already discussed, the State has been and continues to be injured by the federal agencies' actions taken pursuant to ANILCA which regulate or cause to be regulated the harvest of moose within the State's borders in contravention of State regulations adopted to provide for conservation and sustained yield harvest, including harvest by subsistence users. ANILCA's overarching purposes include "conservation of healthy populations of fish and wildlife," "management of fish and wildlife in accordance with recognized scientific principles," and "continued viability" of fish and wildlife populations.[43] Such purposes, which largely correspond with the State's injured interests in conservation, development, and sustained yield wildlife management in this case, are reflected throughout Title VIII of ANILCA.[44] Further, ANILCA calls for federal cooperation with adjacent landowners and managers including State agencies,[45] recognizes State sovereign interests in managing fish and wildlife,[46] and prohibits restrictions on taking of fish and game for nonsubsistence uses outside of national parks and monuments except where necessary for conservation of healthy populations, to continue subsistence uses, or where authorized by other law.[47] Thus, it is clear that allegations of injury to the State's sovereign and proprietary interests

---

[42]    *Id.; Bennett,* 520 U.S. at 176. S*ee also Maine v. Norton*, 257 F.Supp.2d 357, 375 (D. Maine 2003) (holding that in suit under the APA involving implementation of the ESA, for purposes of standing analysis one looks to the substantive provisions of the ESA).

[43]    16 U.S.C. § 3112 (ANILCA § 802).

[44]    *See, e.g.,* §§ 801 & 805 (16 U.S.C. §§ 3111, 3115) (recognized principles of fish and wildlife management and conservation); §§ 804 & 816 (16 U.S.C. §§ 3114, 3116) (continued viability); § 815 (16 U.S.C. § 3125) (conservation of healthy populations).

[45]    16 U.S.C. § 3112(3) (ANILCA § 802).

[46]    16 U.S.C. § 3202(a) (ANILCA § 1314).

[47]    16 U.S.C. § 3125(3) (ANILCA § 815). In ANILCA the term "nonsubsistence uses" is used to refer to all harvests that do not fall within ANILCA's definition of "subsistence uses," including taking by non-rural residents under state subsistence law and taking by rural residents

in sustained yield management of wildlife fall within the "zone of interests" encompassed by

ANILCA and that federal actions interpreting and applying that statute directly affect the State.

     **C.     Because the State of Alaska Is Seeking to Protect Its Own Sovereign and Proprietary Interests, any Prohibition on *Parens Pateriae* Suits against the Federal Government is Inapplicable.**

     It is well established that the doctrine prohibiting a state from bringing *parens pateriae*

suits against the federal government is not applicable where a state seeks to protect its own

sovereign and proprietary interests.  The Ninth Circuit, in *California v. Federal Communications

Commission,*[48] recognized that a state has standing when it is acting "not merely as *parens

pateriae*, but also to vindicate its own sovereign interests.[49]  In that case the court recognized that

state standing arose from sovereign interests in both "law enforcement" and "creating and

enforcing fair and effective" regulations.  Thus, the fact that there may be incidental benefits for

a state's citizens does not deny a state standing to protect its own sovereign and proprietary

interests.[50]  Because the State of Alaska seeks to protect its own sovereign and proprietary

interests any prohibition on *parens pateriae* suits against the federal government does not apply.

**III.     NO DEFERENCE IS DUE TO UNREASONABLE AGENCY INTERPRETATIONS OR TO AGENCY INTERPRETATIONS THAT ARE INCONSISTENT WITH CONTROLLING STATUTES OR REGULATIONS.**

     Court review under the APA of an administrative action such as the one at issue in this

case is not as "deferential" as Defendants contend.  Under the applicable standards outlined in

---

[48]  75 F.3d 1350, 1361 (9th Cir. 1996).

[49]  *Id.*

[50]  *Id.  See also State of Nevada v. Burford,* 918 F.2d 854, 857-58 (9th Cir.1990) (noting that states may demonstrate standing by showing injury to sovereign or proprietary interests and analyzing standing claim based on alleged sovereign and proprietary interests separately from *parens patriae* analysis), *citing Alfred L. Snapp & Son, Inc.,* 458 U.S. at 601-03.

the Memorandum in Support of Plaintiff's Motion for Summary Judgment[51] and also discussed

below, agencies have interpretive latitude and receive deference from a reviewing court only if

the statute or regulation providing standards is ambiguous or silent regarding a specific issue.

Under the first prong of the analysis required under *Chevron U.S.A. v. Natural Resources*

*Defense Council*, 467 U.S. 837, 843 (1984), regulations inconsistent with the plain meaning of

the statute are considered arbitrary and capricious and not in accordance with law.[52]  The courts

"are the final authorities on issues of statutory construction"[53] and "must reject administrative

constructions of a statute inconsistent with a statutory mandate or that frustrate the policy that

Congress sought to implement."[54]

Under the second prong of *Chevron* analysis, even where there is an implicit legislative

delegation to an agency, that agency's construction of a statutory or regulatory provision

governing the agency determination must be set aside as arbitrary and capricious if it is not a

reasonable interpretation consistent with the statute and its legislative history.[55]

Especially significant to the Court's analysis in this case are the related principles that the

---

[51]   Pages 10 -11 (Docket No. 24).
[52]   *Chevron U.S.A.,* 467 U.S. at 842-43 ("the court as well as the agency, must give effect to the unambiguously expressed intent of Congress"); *Bonnischesen v. United States*, 367 F.3d 864, 877 (9th Cir. 2004) (denying *Chevron* deference to agency regulatory interpretation that omitted a present tense restriction present in statute); 5 U.S.C. § 706(2)(A).
[53]   *State of Alaska v. Lyng*, 797 F.2d 1479, 1481 (9th Cir. 1986).
[54]   *Id.  See also Wilderness Society v. U.S. Fish and Wildlife Service*, 353 F.3d 1051, 1060-61 (9th Cir. 2003) (Where a court is able to determine that "Congress spoke clearly" through canons of construction "or other traditional means" of determining Congressional intent, it may not defer to an agency's "contrary interpretation."); *Natural Res. Def. Council v. U.S. Envtl. Protection Agency*, 966 F.2d 1292, 1297 (9th Cir. 1992) ("[Q]uestions of Congressional intent that can be answered with 'traditional tools of statutory construction' are still firmly within the province of the courts"), *citing INS v. Cardoza-Fonseca,* 480 U.S. 421, 447-48 (1987).
[55]   *Chevron U.S.A.,* 467 U.S. at 844-845; *Bonnischesen,* 367 F.3d at 877-78 (no deference to unreasonable regulation); *Sacks v. Office of Foreign Assets Control,* 466 F.3d 764, 778, (9th Cir. 2006) (no deference due to agency's "questionable interpretation" of "plain language" of a regulation).

agency "must articulate a rational connection between the facts found and the conclusions

made,"[56] and "must cogently explain why it has exercised its discretion in a given manner."[57]

The courts must examine the disputed decision's rationale and surrounding circumstances to

"ensure that agency decisions are founded on a reasoned evaluation of the relevant factors."[58]

The courts must conduct a "thorough, probing, in-depth review."[59]  The Court may not defer to

agency line-drawing that lacks supporting rationale in the record,[60] and need not defer even to an

agency's interpretation of its own regulation if the regulation is "unreasonable"[61] or, as in this

case, if "an alternative reading is compelled by the regulation's plain language or by other

indications of . . . intent at the time of the regulation's promulgation."[62]

**IV.    THE POSITIVE C&T DETERMINATION ALLOWING CHISTOCHINA RESIDENTS TO HARVEST MOOSE IN ALL OF UNIT 12 WAS UNSUPPORTED AND CONTRARY TO LAW.**

> **A**.    **Taking From a Customary and Traditional Harvest Area and Population Are Necessary Components of a C&T Determination.**

The Defendants' opposition in this case raises the entirely new and novel argument, not

---

[56]    *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1180 (9th Cir. 2000).
[57]    *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 48 (1983).
[58]    *Desert Citizens*,  231 F.3d at 1180, *citing Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989).
[59]    *Nat'l Ass'n of Home Builders v. Norton*; 340 F.3d 835, 841 (9th Cir. 2003).
[60]    *Id.* at 846-852 (finding that the FWS acted arbitrarily and capriciously in designating the Arizona pygmy-owl as a "distinct population segment" because it did not "articulate a rational basis" in the listing rule for finding the population to be "significant" as required by the rule); *Natural Res. Def. Council*, 966 F.2d at 1297 (holding no deference was due EPA's line-drawing providing an exclusion from storm-water permitting requirements for sites less than five acres because it lacked supporting data); *Safari Club Int'l v. Demientieff*, No. 3:98-cv-00414-HRH, Amended Order filed August 8, 2006 at 26-28, 34-36 (Docket No. 299) (relevant excerpts attached as Ex. E).
[61]    *Bonnischesen*, 367 F.3d at 877-78, *citing Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 481 (2001).
[62]    *Sacks,* 466 F.3d at 778 (holding no deference due agency's "questionable interpretation" of "plain language" of rule), *citing Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

previously advanced by the Board, [63] that "subsistence uses" and C&T regulatory determinations like the one challenged are unrelated to harvest areas or the fish stock or wildlife population being used.[64]  According to the Defendants, so long as residents of the rural community, such as Chistochina, have "customarily and traditionally" consumed moose it does not matter where that moose was harvested or whether it was harvested from a wildlife population previously hunted by that community.  If Defendants' new litigation stance were accepted, the Board would have unfettered power to grant rural residents a priority for subsistence hunting and fishing even in far distant areas where they have never hunted or fished.

Defendants' litigation stance flies in the face of ANILCA's plain language and intent as well as the Board's own regulations for making C&T determinations.   Defendants' argument relies solely on a strained reading in isolation of the general definition of the term "subsistence uses" found in Section 803 of ANILCA (16 U.S.C. § 3113) while ignoring other sections of ANILCA, Congressional intent, and prior regulatory interpretation establishing and acknowledging ANILCA's clear focus on providing a priority for continued subsistence taking of fish and wildlife as a necessary and essential component of those uses and subsistence culture.

---

[63]   *See* R. Tab 49, 2661-63 (denial of the State's Request for Reconsideration (RFR) stating that the Board "chose to apply its finding of a pattern of use to the entire Unit, rather than creating a patchwork of findings"), 2664-69 (RFR analysis).  The Board's reasoning in this case, was not that evidence of customary and traditional taking by the community was not required, but that the Board could make a customary and traditional harvest determination for an entire area defined by broader boundaries than the area of harvest if  any portion of that larger area had been used for harvest -- because staff saw "no additional benefits" to restricting the area of the C&T determination to an area smaller than the entire State Game Management Unit. *See also* R. Tab 34 at 1680, 1686-90 (Wildlife Meeting Materials, Interagency Staff Comm. Recommendation and Staff Analysis),  R. Tab 35, 2154 (Tr., Interagency Staff Comm. oral report acknowledging that "uses are concentrated in a portion of Unit 12," but stating that "no additional benefit to management occurs from creating new portions of a unit for customary and traditional findings in Unit 12."); *Id.* at 2160 (Board member Gottlieb indicating that she thought the Board had heard "substantial evidence" in support of the recommendations of the RACs).

[64]   Br. of Defs. at 23 (Docket No. 32).

The definition of "subsistence uses" in section 803 of ANILCA cannot be read in isolation,[65] and when read in context, it is clear that the legislative intent of ANILCA was to provide a priority for the <u>taking</u> of fish and wildlife for subsistence uses and that such uses were tied to prior customary and traditional taking.  ANILCA's statement of policy clearly states:

> It is hereby declared to be the policy of Congress that -- . . . nonwasteful subsistence uses of fish and wildlife and other renewable resources shall be the priority consumptive uses of all such resources <u>on the public lands</u> of Alaska when it is necessary to restrict <u>taking</u> in order to assure the continued viability of a fish or wildlife population or the <u>continuation</u> of subsistence uses of such population, the <u>taking</u> of such population for nonwasteful subsistence uses shall be given preference on the public lands over other consumptive uses;[66]

Similarly, section 804 of ANILCA clearly states that "the <u>taking on the public lands</u> of fish and wildlife for nonwasteful subsistence uses shall be accorded priority over the <u>taking on such lands</u> for other purposes."[67]  Legislative history reinforces the point that the term customary and traditional is intended to apply to the taking of fish and wildlife.  According to Congress:

> the phrase "customary and traditional" is intended [in Section 803 of ANILCA] to place <u>particular emphasis</u> on the protection and <u>continuation</u> of the <u>taking</u> of fish, wildlife, and other renewable resources <u>in areas of, and by persons</u> (both Native and non-Native) <u>resident in, areas of Alaska</u> in which <u>such uses have played a long established and important role in the economy and culture of the community</u> and in which <u>such uses</u> incorporate beliefs and customs <u>which have been handed down by word of mouth or example from generation to generation</u>.  The factors of <u>local residency</u>, economic dependence, and availability of alternative resources have been included in section 804 rather than in the definition.  Although a truly comprehensive definition of "subsistence uses" must include <u>a mix of those factors</u>, the committee has determined <u>that they should be incorporated through appropriate action by the</u> State <u>rulemaking authority</u> . . .[68]

ANILCA repeatedly references the need to provide for "the <u>continuation</u> of opportunity

---

[65]  *See Bonnischesen*, 367 F.3d at 875 (repeating maxim that a statute must be construed "to give effect, if possible, to every word Congress used").

[66]  *See* 16 U.S.C. § 3112(b) (ANILCA § 802) (emphasis added).

[67]  16 U.S.C. § 3114 (ANILCA § 804)(emphasis added).

[68]  Senate Report No. 96-413 at 269 (emphasis added).

for <u>subsistence uses</u> by rural residents,"[69] "<u>continued subsistence uses</u>," "<u>continuation of the opportunity for subsistence uses</u>," and the need to "<u>continue such uses</u>"[70] and uses the defined term "<u>subsistence uses</u>" throughout, granting a priority only for taking for "<u>subsistence uses</u>"[71] rather than a generic preference for the taking of all fish and wildlife by rural residents.[72]  The terms "continue," "continued," and "continuation" are not defined in the statute and thus must be given their "ordinary or natural meaning,"[73] necessarily meaning that there must have been a <u>preexisting</u> use to be "continued."[74]

"Subsistence uses" are defined as "customary and traditional uses."[75]  Contrary to Defendants' litigation stance, but consistent with ANILCA, the Board's regulations, more fully described below, properly establish that "customary and traditional use" determinations are based on evidence of "continued use" in the form of "consistent harvest" or a "pattern of use."[76] Requiring evidence of the taking of a wildlife population to be "customary and traditional" before granting a subsistence priority for its taking is not only consistent with ANILCA, it is required by ANILCA and by the Board's regulations.  Defendants would have the court relieve them from compliance with both statute and regulation by disregarding one of the basic canons of statutory construction and rendering the term "customary and traditional uses" in the

---

[69]   ANILCA § 801(1) (16 U.S.C. § 3111(1)) (emphasis added).

[70]   *See e.g.* ANILCA § 801(1), (3), (4); § 802(2); § 804; § 815(3) (16 U.S.C. § 3111(1), (3), (4)); § 3112(2);  § 3114; § 3125 (3)).

[71]   *See, e.g.*, ANILCA § 804, (16 U.S.C. § 3114) (the taking on public lands of fish and wildlife for nonwasteful <u>subsistence uses</u> shall be accorded priority over the taking on such lands of fish and wildlife for other purposes.") (emphasis added).

[72]   *See id.*

[73]   *Bonnischesen*, 367 F.3d at 875 (holding that the use of present tense in reference to a tribe that "is indigenous" referred to "presently existing  Indian tribes"), *citing United States v. Alvarez-Sanchez*, 511 U.S. 350, 357 (1994).

[74]   *See* Webster's II New Riverside University Dictionary, 1988 ed.

[75]   *See* Mem. in Supp. of Pl.'s Mot. for Sum. J. at 25 (Docket No. 24); 16 U.S.C. § 3113.

[76]   *See* 50 C.F.R. § 100.16(b)(1)-(4), (b)6)-(8).

definition of "subsistence uses" superfluous, failing to give any effect to ANILCA's clear language limiting its protections to preexisting uses.[77]

Taken together, and as set out more fully in the State's opening memorandum, the standard-setting regulations, adopted by the Board consistent with the Congressional intention set out above, require that the Board, in order to make a C&T determination, "identify the specific community's or area's use of specific fish stocks and wildlife populations" and determine that a community or area generally exemplifies:

> a long-term consistent pattern of use . . . recurring in specific seasons for many years . . .consisting of methods and means of harvest which are characterized by efficiency and economy of effort and cost, conditioned by local characteristics. . . [t]he consistent harvest and use of fish and wildlife as related to past methods and means of taking; near, or reasonably accessible from, the community or area; . . . [a] pattern of use which includes the handing down of knowledge of fishing and hunting [i.e., harvest] skills, values, and lore from generation to generation . . . in which the harvest is shared or distributed within a definable community of persons; . . .[a] pattern of use which relates to reliance upon a wide diversity of fish and wildlife resources of the area and which provides substantial cultural, economic, social, and nutritional elements to the community or area.[78]

The federal regulatory definition of "subsistence uses" mirrors the statutory definition of "subsistence uses;"[79] and regulations dealing with eligibility for "subsistence uses" provide a preference for "taking" for "subsistence uses" to all rural residents only in the interim before a specific C&T determination is made;[80] thereafter limiting the preference for "subsistence taking" to those with a positive C&T designation.[81]  The federal subsistence program C&T framework

---

[77]  *See Bonnischesen*, 367 F.3d at 878 ("we must give effect, if possible to every word Congress used."); *Boise Cascade Corp. v. EPA,* 942 F.2d 1427, 1432 (9th Cir. 1991), *citing* Sutherland Stat. Const. §§46.05, 46.06 (4th ed. 1984).

[78]  50 C.F.R. § 100.16(a),(b) (emphasis added).

[79]  *See* 50 C.F.R. § 100.4 (2005).

[80]  50 C.F.R. § 100.5(c) (2005) (emphasis added).

[81]  50 C.F.R. § 100.5(b) (2005) ("Where the Board has made a customary and traditional use determination regarding  subsistence use of a specific fish stock or wildlife population . . . only those Alaskans who are residents of rural areas or communities designated by the Board are

adopted prior State C&T determinations,[82] included C&T factors similar to preexisting State C&T criteria,[83] and essentially mirrors the pre-*McDowell*[84] State framework, approved by the Secretary, under which "subsistence uses" were required to be "customary and traditional" for the area or community.[85]

When it first promulgated permanent federal subsistence regulations for implementing Title VIII of ANILCA, the federal government recognized that ANILCA requires customary and traditional use determinations on a specific area basis for each wildlife population or fish stock:

> Several commentors felt that customary and traditional use determinations should be made on an area basis rather than an individual species or community basis. People also suggested that any species within the area should be considered a subsistence resource. The legislative history of ANILCA clearly indicates that, with the exception of lands managed by the National Park Service, customary and traditional uses should be evaluated on a community or area basis, rather than an individual basis. It also indicates that the subsistence use of each wildlife population or fish stock must be identified. Consequently, the Federal process for customary and traditional use determinations will consider the customary and traditional use of each wildlife population or fish stock within a given area by the residents of that area.[86]

That regulatory approach is entirely consistent with Title VIII's objectives and purposes.

Defendants' argument that "customary and traditional uses" represent a mere description

---

eligible for subsistence taking of that population or stock on public lands for subsistence.") (emphasis added). *See also* 57 Fed. Reg. 22940, 22942 (1992) (regulatory preamble).

[82]  *See* 55 Fed. Reg. 27114, 27125 (1990)(adopting state C&T determinations as temporary regulations); *see also* 57 Fed. Reg. 22940, 22947-48 (1992) (final rules noting that changes to C&T determinations adopted from state regulations had not been made).

[83]  *Compare* 57 Fed. Reg. 22940, 22956 (1992) *with* 5 AAC § 99.010 (1988; Register 107).

[84]  *McDowell v State,* 785 P.2d 1 (1989).

[85]  *Id.* at 3 (noting compliance); *id.* at 17 n.11 (Rabinowitz, dissenting). The federal subsistence priority program is unlike the current, post-*McDowell* state system, in which any resident may engage in subsistence hunting or fishing outside of nonsubsistence areas if any group of residents has established a customary and traditional use of the stock or population.

[86]  57 Fed. Reg. 22940, 22948 (1992)(preamble discussion of C&T determination process) (emphasis added). The Board modified its procedures for making C&T determinations in 1995, but did not change the language tying C&T determinations to a community or area's customary

of how subsistence resources are consumed is also in conflict with other statements of the federal government.  In the context of a challenge to a regulation authorizing a particular use of wildlife, the federal government has previously taken the position that individual uses do not have to be "customary and traditional,"[87] and in the context of making customary and traditional use determinations the federal Office of Subsistence Management official Technical Writing Guide specifically instructs that it is inappropriate to recommend a positive C&T determination without evidence of harvest upon the Federal public lands or waters.[88]

ANILCA, its legislative history, and the Board's own regulations all require that subsistence taking be "customary and traditional."  To suggest that custom and tradition relate only to the consumption of the wildlife and not to the methods, means, and area of the harvest, as the defense does, is to ignore the intent behind ANILCA's subsistence priority, and to depart from long established regulatory interpretation.  It is no accident that most federal subsistence regulations in Alaska deal with the species, methods, means, numbers, and areas of the permitted hunt or harvest and very few address the methods or means of use or consumption.[89]  Contrary to Defendants' new arguments, C&T determinations are made, and must be made, to establish

---

and traditional harvest and use of a specific stock or population within a specific area. *See* 60 Fed. Reg. 40459 (1995).

[87]    *See, e.g.*, R. at Tab 34, 1711 (Wildlife Meeting Materials, staff analysis stating "[A] reasonable interpretation of ANILCA . . . is that as long as the use (*i.e.* harvest for personal or family consumption) of the bear is customary and traditional, no additional determination is necessary for each specific part of the bear.") (emphasis added).

[88]    *See, e.g.,* Ex. F (excerpt from Federal Subsistence Management Program Technical Writing Guide at 21 (2005) ("[T]he C&T analysis would not recommend a positive determination if the C&T analysis determines that the use is not on the Federal public lands or waters.").  Clearly, that federal statement is also made in the context of where the harvest "use" occurs, not where consumption occurs, which need not be on federal lands.

[89]    The Board's regulations do not limit what part of the moose or fish may be eaten or how it must be prepared and served, and only one of the customary and traditional use factors deals at all with means of handling, preparing, preserving, and storing fish or wildlife -- and that factor specifically allows for alteration of past practices.  *See* 50 C.F.R. § 100.16(b)(5).

priority rights for harvest of particular fish or wildlife stocks or populations in specific areas.

Defendants' current litigation stance is inconsistent with the Board's own regulatory framework and past interpretation, ignores ANILCA's plain language and legislative history, infringes broadly on State sovereignty despite ANILCA's clear language limiting infringement, and casts ANILCA as providing the Board with unfettered discretion to provide Chistochina a priority for the taking of fish and wildlife throughout Alaska. Defendants' litigation stance would allow or even require the Board to extend Chistochina's subsistence priority for moose across Alaska from its eastern border with Canada to the western border of the Bering Sea and to grant Barrow residents a subsistence priority on the Kenai River for salmon. This expansive interpretation, which would provide residents of all rural areas a priority to the use of fish stocks and wildlife populations wherever located in Alaska, even where not easily or economically accessible and never "customarily and traditionally" used by the local community or area,[90] does not further the purposes of Title VIII of ANILCA.

**B.    The Chistochina C&T Determination Being Challenged Is Not Supported by the Board Record.**

Defendants acknowledge that "evidence of actual use" throughout Unit 12 is "limited".[91]

---

[90]    In the case at hand, despite harvest data reaching back to 1964, R. Tab 34 at 1688, and studies of historical Ahtna use, *id.* at 1684, 1688, actual use was only shown for 206 square miles in Unit 12, and all areas of actual and attenuated historical use could have been contained within logical geographic boundaries in an area representing only 25 percent of the area in Unit 12. *See* R. Tab 41, 2523-2525. Defendants also admit that "the areas to which the State objects in this case are largely in remote areas that are not readily accessible by the residents of Chistochina, and are not likely to be used extensively." Defs.' Br. at 25 (Docket No. 32).

[91]    Defs.' Br. at 25. By "use", Defendants clearly mean harvest use patterns, something that must be demonstrated according to their own regulations in order to warrant a C&T determination. Notably, Chistochina, the point of consumption, is approximately 37 air miles and 46 road miles from the nearest portions of Unit 12, *see Compl.* at ¶ 29 (Docket No. 1); Answers of Defs. and  Int. Defs. at ¶ 29 (Docket Nos. 7, 2).  The Court can take judicial notice that few if any of those residences where consumption occurs would be located on federal public lands. The 2.06 percent (206 square mile) portion of Unit 12 in which actual harvest was shown

They also make a new argument that it would be unfair and unreasonable to require

demonstrated customary and traditional use before granting a subsistence priority.[92]

   Based on the record, defendants' "acknowledgement" is an understatement, and their

further argument that customary and traditional harvest patterns need not be shown is contrary to

their own regulations, as well as ANILCA.  The absence of evidence of any pattern of  pre-

existing use by the residents of  Chistochina or even of their ancestors within over 7,500 square

miles of Unit 12 means that the C&T determination for that entire Unit is based solely on

speculation.  The C&T determination was thus unreasonable and was arbitrary and capricious.

   Prior to the Board's unsupported C&T determination for all of Unit 12, Chistochina

residents already had positive C&T determinations for moose on federal lands within an area

encompassing over 37,000 square miles.[93]   Defendants assert that the areas where Plaintiff

challenges the new C&T determination "are largely in remote areas that are not readily

accessible by residents of Chistochina, and are not likely to be used extensively by residents of

Chistochina."[94]  That, combined with Defendants' understated acknowledgment that any

evidence of past use of the area by Chistochina for subsistence is "limited," counters any

contention that it would be unreasonable or unfair to require evidence of a "long-term consistent

pattern of use" of "specific fish stocks or wildlife populations," "recurring in specific seasons for

---

to have occurred, *see* R. Tab 42 at 2523, is concentrated around the closest road accessible areas
in Unit 12, *see* Exs. A, B, and the 2500 square mile area suggested as a logical geographic
boundary for the area including Ahtna historical and cultural sites expands upon that area,  *id.*
Not surprisingly, the additional 7,500 square miles of Unit 12 which is the principal subject of
this challenge and which lacks any evidence of having been used for subsistence purposes by
residents of Chistochina – customarily, traditionally, or otherwise – is further from the
community.  Indeed, much of that area is over 100 air miles from Chistochina; further by road or
overland.  *See, e.g.,* Ex. A*; DeLorme, Alaska Atlas & Gazetteer* 97-99, 108-09 (2004 5th ed.).
[92]   Defs.' Br. at 26 (Docket No. 32).
[93]   R. Tab 41 at 2523.
[94]   Br. of Defs. at 25.

many years," as is required under the Board's regulations.[95]

Defendants' additional argument, also raised for the first time in their brief -- that "lack of information" regarding any historical use within the challenged area "might" be due to a decline in the moose population in the 1970s -- is entirely speculative; concerns only a limited slice of time; and was not presented to the Board.[96]  Such *post hoc* rationalization, which ignores the documentation actually considered by the Board tracking modern usage back to 1964[97] and also describing historical Ahtna usage,[98] does nothing to bolster the Board's determination.

Indeed, the only "support" which the Defendants cite in an effort to shore up their overbroad C&T determination is Chistochina's "link" to the larger Ahtna community and general statements from Ahtna Inc.'s subsistence committee that it "supported" a C&T determination for Chistochina throughout Unit 12 and that residents of Chistochina used Unit 12 for taking wildlife including moose.[99]  The Board could not reasonably rely on those general statements of political "support," given the extensive available evidence of recent and historical use which showed a concentrated usage pattern for Chistochina extending marginally into prior C&T areas for other communities and areas but not including any evidence of use in more than 75 percent of Unit 12.

Even the proponent of the proposal for the C&T determination only represented that usage had occurred in the southern portion of Unit 12, describing the area in which moose harvest had occurred as:

> All areas east of the Nabesna river and south of the Winter Trail.  This includes, but is not limited to rivers, lakes, and creeks in the Chisana area (e.g. Chisana

---

[95]    *See* 50 C.F.R. § 100.16.

[96]    *See*  R. Tab 34 at 1679-91 (Meeting Materials); R. Tab 35 at 2148-61 (Tr.).
[97]    *See, e.g.,* R. Tab 34 at 1687-88 (Meeting Materials)
[98]    *Id.* at 1684, 1688.
[99]     Defs.' Br. at 27-28 (Docket No. 32); *see also* R. Tab 34 at 1681 (Meeting Materials, comments).

River, Cross Creek, Notch Creek) and in the White River area.[100]

The Board could not reasonably ignore both the available data and the proposal proponent's own description of the harvest area in the manner it did, extending its C&T determination significantly beyond the areas in which usage was shown and specifically alleged to have occurred. However, the record makes it clear that this is exactly what the Board did, simply "determining" that Chistochina's customary and traditional harvest extended into the borders of C&T areas previously determined other communities and areas[101] and then extending Chistochina's determination to include those entire other areas because the Board's staff saw "no additional benefit to management"[102] from properly limiting that determination to where the Board could reasonably conclude Chistochina's customary and traditional harvest had occurred.

The Board does not have discretion to draw irrational lines that have the effect of granting a harvest priority to a group of rural residents not entitled to a subsistence priority in that area under ANILCA or the Board's regulations. Because the Board's line drawing in this instance violated its statutory authorities and the Board's own regulations, it must be set aside as arbitrary and capricious.

C.    **The Defendants May Not Blindly Defer to Regional Advisory Council Recommendations that Are Not Supported by the Record before the Board.**

Contrary to their final argument, the defendants may not rest blindly on the

---

[100]    R. Tab 1 at 2. (Federal Subsistence Wildlife Proposal from the Cheesh-na Tribal Council).

[101]    *See, e.g.,* R. Tab 35 at 2149 (Tr.,  OSM staff summary:  "Chistochina subsistence use activities in Unit 12 extend beyond the area labeled (A) on the Unit 12 map including parts of areas labeled (B) and (C).") (emphasis added).

[102]    *See, e.g.,* R. Tab 35 at 2154 (Tr., Interagency staff recommendation); R. Tab 49 at 2662 (RFR denial stating the Board "chose to apply its finding of a pattern of use to the entire Unit, rather than creating a patchwork of findings").  The staff recommendation ignored the fact that ADF&G, the entity responsible for wildlife management, did see a benefit to management from

recommendations of a regional advisory council without violating ANILCA, the APA, and the

Federal Advisory Committee Act (FACA), 5 U.S.C. App. 2.  In essence, the Defendants argue

that the Board may effectively abrogate its independent decision-making responsibility and avoid

all standards of review by deferring to a RAC regardless of whether the RAC's recommendation

is supported by a rational basis in the record.  Such assertions are clearly contrary to the law.

 Defendants seek to effectively de-emphasize the standards for gauging RAC

recommendations in section 805(c) of ANILCA by construing the section in isolation, failing to

harmonize it with other statutes or even with other provisions of ANILCA.  Section 805(c)

provides that that the Secretary "shall <u>consider</u>" RAC reports and recommendations and then that

> [t]he Secretary [or Board] may choose not to follow any recommendation which
> he determines is not supported by substantial evidence, violates recognized
> principles of fish and wildlife conservation, or would be detrimental to the
> satisfaction of subsistence needs. . . [103]

Defendants seek to avoid this clear mandate by ignoring the word "consider" and instead

emphasizing that the phrase "may chose not to follow" is used in reference to the standards for

gauging RAC recommendations, including the provision regarding rejection of recommendations

that are not supported by substantial evidence.  Defendants, only in their argument, seek to

further de-emphasize that duty to consider by characterizing that provision as <u>only</u> allowing

rejection of a recommendation of a RAC relating to the taking of fish or wildlife if the Secretary

(or Board) finds that one of the three listed factors is present.  Adoption of Defendants'

interpretation would require the Court to ignore basic rules of statutory construction by rendering

the term "consider," and portions of section 815 and 816 limiting and preserving Secretarial

---

properly limiting the scope of the Board's determination and requested that the Board limit its
determination to areas in which harvest was demonstrated.  *See, e.g.,* R. Tab 35 at 2155-57.
[103]    16 U.S.C. § 3115 (emphasis added).  This language is also essentially mirrored for the
Board in 50 C.F.R. § 100.10(e).

authority, superfluous,[104] and by failing to "construe statutes harmoniously where that can

reasonably be done."[105]

When read in context, Congress imposed a mandatory duty to "<u>consider</u>" RAC

recommendations and included some standards in section 805(c) of ANILCA guiding that

consideration, making it clear, among other things, that a recommendation did not have to be

followed if "<u>not supported by substantial evidence</u>."[106]  The statute's use of the term "<u>consider</u>"

makes it clear that the Board must exercise its independent judgment and that recommendations

of the regional <u>advisory</u> councils are, after all, only <u>advisory</u>.[107]

The statute does not use the word "<u>only</u>" with regard to the provisions guiding such

consideration and such a restriction cannot be inferred.  Only the Defendant's use that word, and

only in their argument.  The fact that Congress clearly did not intend the three listed factors to

provide the only basis for rejection of RAC recommendations is clearly evidenced by other

provisions of ANILCA specifically prohibiting restrictions on taking of fish and wildlife for

nonsubsistence use "unless necessary" for certain objectives,[108] preserving the closure authority

of the Secretary,[109] and restricting the diminishment of State authority over management of fish

and wildlife.[110]  Congress certainly did not intend to require the Secretary to adopt

---

[104]  *See Bonnischesen*, 367 F.3d at 878 ("we must give effect, if possible to every word Congress used."); *Boise Cascade Corp. v. EPA,* 942 F.2d 1427, 1432 (9th Cir. 1991), *citing* Sutherland Stat. Const. §§46.05, 46.06 (4th ed. 1984).
[105]  *Voting Integrity Proj. Inc. v. Keisling,* 259 F.3d 1169, 1176 (9th Cir. 2001) *citing* Sutherland Stat. Const. § 53.01 (5th Ed.).
[106]  16 U.S.C. 3115(c) (ANILCA § 805).
[107]  "Consider" generally means "[t]o fix the mind on, with a view to careful examination; to examine; to inspect.  To deliberate about and ponder over.  To entertain or give heed to." *Black's Law Dictionary* (6th ed. 1990).
[108]  16 U.S.C. § 3125 (ANILCA § 815).
[109]  16 U.S.C. § 3126 (ANILCA § 816).
[110]  16 U.S.C. § 3202 (ANILCA § 1314).

recommendations violating other statutory provisions of ANILCA, and this is implicitly reflected in the Board's regulations which do recognize other factors.[111]  Similarly, there is nothing in ANILCA section 805(c) to indicate that it should be read to override generally applicable requirements of the APA concerning agency actions,[112] or the FACA concerning advisory councils.[113]  Section 805(c) should not be ignored, as Defendants effectively seek to do, in cases where the Board does not reject a RAC recommendation because it sets a standard for gauging RAC recommendations and the Board's consideration of those recommendations. That statutory need to consider whether substantial evidence exists in the record is bolstered by the Board's regulation at 50 CFR § 100.11(c)(3) which specifically provides that the RAC "recommendations to the Board should be supported by <u>substantial evidence</u>".  (Emphasis added).

Therefore, the Board is only required to "consider," not defer to, recommendations of a RAC, and those recommendations should be supported by substantial evidence.[114]  Under the APA's arbitrary and capricious standard of review, the Federal Subsistence Board "must articulate a rational connection between the facts found and the conclusions made"[115] and "must

---

[111]  *See* 50 C.F.R. § 100.11(e) (citing the three factors of ANILCA § 805(c) but also citing factors of public safety, administration, and assuring continued viability).
[112]  5 U.S.C. §§ 701-706.
[113]  5 U.S.C. App. 2.
[114]  Defendants go so far as to suggest that this Court has held otherwise, citing *Safari Club Int'l et al. v. Demientieff et al.,* No. A98-0414-CV (HRH) (Dist.  Alaska), Order filed Feb. 27, 2001, at 5-9.  However, review of that Order (Defs,' Ex. 5), reveals that the Court instead concluded that Section 3115(c) requires "that the Secretary or the FSB '<u>consider</u>' council recommendations, which indicates that the FSB must engage in <u>some kind of review or evaluation</u> of council recommendations before deciding to accept or adopt a particular recommendation" and declined to dismiss a claim that the FSB had acted contrary to law by failing to critically review or evaluate RAC recommendations. *Id.*, at pp. 8-9 (emphasis added).
[115]  *Desert Citizens Against Pollution*, 231 F.3d at1180.

cogently explain why it has exercised its discretion in a given manner."[116] Furthermore, FACA

prohibits advisory committees such as the regional advisory councils from having rulemaking

authority.[117] Accepting the Defendants' argument that the Board may simply defer to a regional

advisory council would have the effect of not only granting the RACs rulemaking authority but

also making their exercise of that authority unreviewable.

Thus, the Board could not blindly rely on the recommendations of the RACs in the face

of conflicting evidence. Even where an agency decision is supported by substantial evidence, it

may be found arbitrary and capricious "where other evidence in the record detracts from that

relied upon by the agency."[118] Further, as the Ninth Circuit Court has also found, "[w]hen the

arbitrary and capricious standard is performing the function of assuring factual support, there is

no substantive difference between what it requires and what would be required by the substantial

evidence test."[119] The question for the court is whether there is "such relevant evidence as a

reasonable mind might accept to support a conclusion."[120]

The State respectfully submits that a reasonable mind could not accept unsupported

recommendations from RACs that a C&T determination for harvest on federal lands within an

entire 10,000 square mile Game Unit -- large portions of which allegedly contain no federal

---

[116]   *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 48 (1983). *Accord*, this Court's
Order of August 8, 2006 in *Safari Club Int'l v. Demientieff*, cited in footnote 60, *supra* (Ex. 5).
[117]   5 U.S.C. App. 2 § (2)(b)(6) (provides "the function of advisory committees should be
advisory only" and "all matters under their consideration should be determined, in accordance
with law, by the official, agency or officer involved"). As this Court previously observed in a
January 16, 2004 Summary Judgment Order in *Safari Club Int'l v. Demientieff*, No. A98-0414-
CV (HRH) at 15-16, the regulations at 50 C.F.R. § 100.11(c)(2)(i) governing the RACs provide:
 "[t]he regional advisory councils must also: [o]perate in conformance with the provisions of
FACA [Federal Advisory Committee Act, 5 U.S.C. app.2 §§ 1-15 (1972)] and comply with rules
of operation established by the Board . . . ." (emphasis added).
[118]   *American Tugboat Ass'n v. Baldridge*, 738 F.2d 1013, 1016 (9th Cir. 1984) (finding NOAA
decision arbitrary and capricious because of unsupported rejection of available data).
[119]   *Bonnischesen*, 367 F.3d at 880 n.19 (emphasis added; citations omitted).

lands -- is needed, when the record as a whole shows that "the documented uses by Chistochina residents are concentrated in a portion of Unit 12,"[121] composed of less than 25 percent of the Unit.

## V.  CONCLUSION

For the foregoing reasons, and for the reasons set forth in Plaintiff's complaint and the Memorandum in Support of Plaintiff's Motion for Summary Judgment, this Court has jurisdiction over this matter and judgment should be entered invalidating the C&T determination for moose for residents of Chistochina published at 70 Fed. Reg. 36268, 36274.[122]  The Board's record demonstrates C&T use by residents of Chistochina for only a small portion of Unit 12. The Federal Subsistence Board acted arbitrarily and capriciously and in violation of its statutes and regulations when it made a customary and traditional harvest determination for all of Unit 12 based on a record that demonstrated such use of only a small portion of the unit.

RESPECTFULLY SUBMITTED this 4th day of April, 2007.

TALIS J. COLBERG
ATTORNEY GENERAL

By:     s/Steven a. Daugherty
        Steven A. Daugherty
        Assistant Attorney General
        Alaska Bar No. 9406032
        1031 W. 4th Avenue, Suite 200
        Anchorage, Alaska 99501
        Ph: (907) 269-5257
        Fax: (907) 279-2834
        Email: steven_daugherty@law.state.ak.us

        Counsel for Plaintiff State of Alaska

---

[120]  *Id.*
[121]  *See, e.g.,* R. Tab 35 at 2154 (Tr., Interagency Staff Recommendation); R. Tab 35 at 1684 (Meeting materials, map showing areas of historical use); R. Tab 41 at 2523-25 (ADF&G analysis showing areas of use from the record and logical boundaries).
[122]  R. Tab 39, 2287.