IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

STATE OF ALASKA,                     )
                                     )
                    Plaintiff,       )
                                     )
          vs.                        )
                                     )
MICHAEL FLEAGLE, Chairman, Fed-      )
eral Subsistence Board, et al.,      )
                                     )
                    Defendants.      )
                                     )
          and                        )
                                     )
CHEESH-NA TRIBAL COUNCIL and         )
LARRY SINYON,                        )
                                     )   No. 3:06cv0107-HRH
               Defendant-Intervenors. )
_____ )


O R D E R

Motion for Summary Judgment

        Plaintiff moves for summary judgment.[1]  Plaintiff would have
the court invalidate a customary and traditional use of moose
determination by the Federal Subsistence Board.  This motion is
opposed.[2]  Defendants would have the court dismiss plaintiff's

_____

        [1]Docket No. 23.

        [2]Docket Nos. 32 and 33.

-1-

complaint for lack of jurisdiction or sustain the Federal Subsistence Board's determination and dismiss plaintiff's complaint with prejudice.  Oral argument has not been requested and is not deemed necessary.

Background

Plaintiff is the State of Alaska.  Defendants are Michael Fleagle, chairman of the Federal Subsistence Board; Dirk Kempthorne, Secretary of the Interior; and Mike Johanns, Secretary of Agriculture.  Defendant-Intervenors are the Cheesh-na Tribal Council and Larry Sinyon.

Plaintiff challenges a 2005 regulation which expands the customary and traditional use determination (C&T determination) for moose for the community of Chistochina to include all of Game Management Unit (GMU) 12.[3]  C&T determinations are part of the Secretaries' regulatory scheme for implementing the subsistence preference established by Title VIII of the Alaska National Interest Lands Conservation Act of 1980 (ANILCA), 16 U.S.C. §§ 3101-26.  Title VIII establishes a priority for the taking of fish and wildlife on federal public lands in Alaska for non-wasteful subsistence uses by rural Alaska residents.  16 U.S.C. § 3114.

_____

[3]The State of Alaska divided the state into 26 geographical areas for purposes of hunting and trapping regulation.  When the federal government began managing subsistence hunting and fishing on public lands in 1990, it incorporated the State's GMUs into its regulatory regime.

The Secretaries created the Federal Subsistence Board (FSB) to administer the subsistence preference in Alaska. The FSB has been delegated the authority to "[d]etermine which rural Alaska areas or communities have customary and traditional subsistence uses of specific fish and wildlife populations[.]" 50 C.F.R. § 100.10(d)(4)(iii).[4] The regulations provide that the FSB

> shall determine which fish stocks and wildlife populations have been customarily and traditionally used for subsistence. These determinations shall identify the specific community's or area's use of specific fish stocks and wildlife populations.

50 C.F.R. § 100.16(a). The regulations further provide:

> Where the Board has made a customary and traditional use determination regarding subsistence use of a specific fish stock or wildlife population, in accordance with, and as listed in, § 100.24,[5] only those Alaskans who are residents of rural areas or communities designated by the Board are eligible for subsistence taking of that population or stock on public lands for subsistence uses under the regulations in this part. If you do not live in one of those areas or communities, you may not take fish or wildlife from that population or stock, on public lands under the regulations in this part.

50 C.F.R. § 100.5(b).

_____

[4]The Secretary of Interior regulations are found at Title 50 of the Code of Federal Regulations, Part 100. The Secretary of Agriculture regulations are found at Title 36 of the Code of Federal Regulations, Part 242. This order will cite only to the version of the regulations found at Title 50, Part 100.

[5]C&T determinations are published at 50 C.F.R. § 100.24.

The FSB is required to make C&T determinations by applying eight factors and a community or area seeking a C&T determination "shall generally exhibit" the same eight factors.  50 C.F.R. § 100.16(b).  The FSB must "take into consideration the reports and recommendations of any appropriate Regional Council regarding customary and traditional uses of subsistence resources."[6]  Id. at § 100.16(c).  The FSB "may choose not to follow any Regional Council recommendation which it determines is not supported by substantial evidence, violates recognized principles of fish and wildlife conservation, [or] would be detrimental to the satisfaction of subsistence needs[.]"  50 C.F.R. § 100.10(e).

The C&T determination at issue here involves GMU 12.  GMU 12 contains both state land and federal public land and "consists of the Tanana River drainage upstream from the Robertson River, including all drainages into the east bank of the Robertson River, and the White River drainage in Alaska, but excluding the Ladue River drainage."  50 C.F.R. § 100.26(n)(12).  GMU 12 is 10,000 square miles.  Prior to the amendment of the regulation at issue here, the moose C&T determination for Chistochina residents in GMU 12 consisted of 1,333 square miles.  After the adoption of the regulation, the C&T determination applied to all 10,000 square

---

[6]There are ten regional advisory councils (RACs).  The RACs are intended to "provide a regional forum for the collection and expression of opinions and recommendations on matters related to subsistence taking and uses of fish and wildlife resources on public lands."  50 C.F.R. § 100.11(a).

-4-

miles.  But, the regulation only applies on the federal public lands within GMU 12.  Fifty-nine percent of GMU 12 is federal public land (48% of which is within the Wrangell-St. Elias National Park and Preserve and 11% is within the Tetlin National Wildlife Refuge).  Forty-one percent of GMU 12 is state land.  The state land is in the northern portion of GMU 12.

Prior to the 2005 amendment at issue here, the moose C&T determination in GMU 12 was:

| | |
|---|---|
| Unit 12 -- south of a line from Noyes Mountain, south-east of the confluence of Tatschunda Creek to Nabesna River | Residents of Unit 11 north of 62nd parallel, residents of Unit 12, 13(A)-(D) and the residents of Chickaloon, Dot Lake, and Healy Lake |
| Unit 12 -- east of the Nabesna River and Nabesna Glacier, south of the Winter Trail from Pickerel Lake to the Canadian Border | Residents of Unit 12 and Healy Lake |
| Unit 12 -- remainder | Residents of Unit 12, Dot Lake, Healy Lake, and Mentasta Lake. |

50 C.F.R. § 100.24(a)(1) (2004).

In October 2004, the Cheesh-na Tribal Council submitted a proposal to change the C&T determination for moose in GMU 12 for residents of Chistochina.  Chistochina is small community of approximately 93 residents located on the Tok Cutoff of the Glen Highway.  Chistochina is located in GMU 13C and is also close to the boundary of GMU 11.  Chistochina had a C&T determination for

moose in all of GMU 13 and GMU 11 and a portion of GMU 12.[7]  The change being proposed was to give Chistochina a C&T determination for all of GMU 12.  The proposal stated that moose had been harvested by Chistochina residents in "[a]ll areas east of the Nabesna river and south of the Winter Trail.  This includes, but is not limited to rivers, lakes and creeks in the Chisana area (e.g., Chisana River, Cross Creek, Notch Creek) and in the White River area."[8]

The Eastern Interior RAC took up the proposal at its March 2005 meeting because GMU 12 is within the area served by this council.  Prior to that meeting, Office of Subsistence Management staff had developed a written analysis of the proposal and that analysis was included in the meeting materials for the March 2005

---

[7]During consideration of the proposal, the area for which Chistochina already had a moose C&T determination was referred to as area A.  This area is described in the regulations as the area south of a line from Noyes Mountain, southeast of the confluence of the Tatschunda Creek to Nabesna River.  The other two areas of GMU 12 were referred to as areas B and C.  Area B is the area east of the Nabesna River and Nabesna Glacier, south of the Winter Trail from Pickerel Lake to the Canadian Border.  Area C is the remainder of Unit 12.
Units 11, 12, and 13(c) each have a common boundary with one of Units 11, 12, and 13(c) and all three boundaries meet at a point near Noyes Mountain, a reference point for Chistochina's original moose C&T determination in GMU 12.  See Unit 12 Map/Hunting, Exhibit 2, Brief of the Defendants, Docket No. 32.

[8]Federal Subsistence Wildlife Proposal, Admin. Rec. at Tab 1, page 2.

meeting.[9]  The staff analysis considered each of the eight regula-
tory factors[10] and the preliminary conclusion was to support the
proposal because

> [d]ocumentation of the customary and tradi-
> tional use of moose in the other portions of
> Unit 12 (B and C) by residents of Chistochina
> is shown through community harvest resource
> mapping and site specific investigations
> within these areas.  Their levels of use are
> very similar to the communities that have a
> positive customary and traditional use deter-
> mination in these portions of Unit 12.[[11]]

Included in the staff analysis were comments from the Alaska
Department of Fish & Game that the evidence submitted did not show
that the pattern of use extended through all areas of Unit 12 and
that regional councils "may wish to discuss whether changes to the
existing C&T finding should be limited to areas of Unit 12 where
moose hunting by residents of Chistochina has been documented."[12]

The proposal was presented to the Eastern Interior RAC by a
staff member of the Office of Subsistence Management.  She outlined
the staff analysis, going through several of the eight regulatory
C&T factors.  As for actual use of moose by Chistochina residents
in Unit 12, she noted that "mapping of moose harvest areas showed

---

[9]Wildlife Meeting Materials, Admin. Rec. at Tab 14, pages 183-
192.

[10]Id. at pages 187-190.

[11]Id. at page 191.

[12]Id. at page 192.

residents of Chistochina used the Nabesna River drainage beyond the A portion, north to Pickerel Lake and east of the Nabesna River along Stone Creek, Cooper Creek and Camp Creek."[13]  She also noted that "[h]istorical occupancy and use of [Ahtna] sites on a seasonal basis for subsistence activities, including moose harvesting, throughout the 1970s was described for a location at the confluence of Cooper Creek with the Nabesna River and another location near the confluence of the Cross and North Creeks northwest of Chisana for the B portion and Pickerel Lakes locations for the C portion."[14]

The Eastern Interior RAC's discussion about the proposal focused on whether or not the proposal should have also included the community of Mentasta.  The staff member explained that the agency only did an analysis for the specific community requesting the C&T determination and if Mentasta wanted to change its C&T determination, it could make its own proposal to do so.[15]  A representative from the Alaska Department of Fish and Game commented about use not being shown for all of GMU 12.[16]  The Eastern Interior RAC voted to support the proposal.[17]

---

[13]Transcript of Eastern Interior Regional Subsistence Advisory Council Meeting, March 2, 2005, Admin. Rec. at Tab 15, page 458.

[14]Id.

[15]Id. at page 459.

[16]Id. at page 460.

[17]Id. at page 468.

The proposal was also considered by the Southcentral RAC at its March 2005 meeting because Chistochina is located in the area served by the Southcentral council.  The same draft staff analysis was included in the meeting materials.[18]  Basically the same staff presentation was made to the Southcentral RAC as had been made at the Eastern Interior RAC meeting.[19]  The focus of the discussion was on whether the Southcentral RAC should take any action or simply defer to the Eastern Interior RAC since the land in question was within that region.[20]  A representative from the Alaska Department of Fish and Game again brought up the fact that "[t]he evidence presented in the analysis does not show that Chistochina has hunted throughout all of Unit 12"[21] and again suggested that the council might want to discuss whether the change to the C&T determination should be limited to the areas of GMU 12 for which there was evidence of actual use.[22]  The Southcentral RAC voted to support the proposal.[23]

---

[18]Draft Staff Analysis, Admin. Rec. at Tab 20, pages 762-771.

[19]Transcript of Southcentral Federal Subsistence Regional Advisory Council Public Meeting, March 16, 2005, Admin. Rec. at Tab 22, pages 919-923.

[20]Id. at pages 924-927.

[21]Id. at page 923.

[22]Id.

[23]Id. at page 927.

-9-

The proposal was then considered by the FSB at its May 2005 meeting. The meeting materials for the FSB May 2005 meeting included the staff analysis that had been given to the RACS.[24] The meeting materials also included the Interagency Staff Committee Recommendation, which was to support the proposal.[25] The justification for this recommendation included the following:

> The documented uses by Chistochina residents are concentrated in a portion of Unit 12. The Federal Subsistence Management Program has a varying practice in which some customary and traditional use determinations are for whole units, while some are attributed to sub-units, or portions of units. Generally, these reflect differences in the intensity of management required for either biological conservation or allocation purposes. In this instance, the Interagency Staff Committee noted that both the Southcentral and Eastern Regional Councils affected by this proposal supported a finding of customary and traditional uses for the whole of Unit 12, rather than defining a new portion of the Unit in which the uses would be recognized. The Interagency Staff Committee concurs with the two Councils that no additional benefit to management occurs from creating new portions of the unit for customary and traditional findings in Unit 12.[26]

AT the FSB meeting, a staff member provided an oral summary of the proposal. She highlighted regulatory factor four, which deals with

---

[24]Federal Subsistence Board Wildlife Meeting Materials, May 3-4, 2005, Admin. Rec. at Tab 34, pages 1682-1691.

[25]Id. at page 1680.

[26]Id.

-10-

consistent harvest for the area.[27]  The staff member stated:

> The available permit information for
> Chistochina residents from 1991 to 2002 shows
> the harvest of moose in the portion labeled
> (A) of Unit 12 where the community has an
> existing customary and traditional determina-
> tion.  However, mapping of community resource
> harvest areas for Chistochina residents under-
> taken in conjunction with 1982 household
> surveys showed traditional moose harvest
> occurred in a larger area than existing Fed-
> eral regulation allows.  For Unit 12 mapping
> of moose harvest areas showed residents of
> Chistochina used the Nabesna River drainage
> beyond the (A) portion, plus Pickerel Lake in
> the northern area and along drainages east of
> the Nabesna River in the (B) area.
> ...[A]dditional information on the use of
> the eastern and northern portions of Unit 12
> by Chistochina was provided in the investiga-
> tion reports for historical and site applica-
> tions submitted by AHTNA.  Historical occu-
> pancy and use of sites on a seasonal basis for
> subsistence activities, including moose har-
> vesting, throughout the 1970s was described
> for locations indicated by triangles on Map
> 2[[28]] for the (B) portion and the Pickerel Lake
> locations north of the winter trail for the
> (C) portion.[[29]]

Also testifying at the FSB meeting was Wilson Justin, the
subsistence advocate for the Cheesh-na Tribal Council.  He stated
that the residents of Chistochina had "established a clear and
relatively consistent use of Unit 12, perhaps not very visible but

---

[27]Transcript of Federal Subsistence Board Public Regulatory
Meeting, May 3, 2005, Admin. Rec. at Tab 35, page 2149.

[28]Map 2 can be found at Tab 34, page 1684 of the Administrative
Record.

[29]Admin. Rec. at Tab 35, pages 2149-50.

still clear use."[30]  He spoke of one Chistochina resident who hunts mostly in the Chisana area.[31]  A representative from the Staff Committee reiterated the Committee's position "that no additional benefit to management occurs from creating new portions of a unit for customary and traditional findings in Unit 12."[32]  A representative from the Alaska Department of Fish and Game testified that the "Department supports the proposal with modification."[33]  The Department recommended that the C&T determination should only extend "to those parts of the unit where the community has established a customary and traditional pattern of use."[34]  The Department viewed this proposal as being similar to earlier proposals involving a C&T determination for moose for GMU 11 for residents in communities which were located in GMU 12.  "In that case and on the basis of the available evidence, the Board limited the customary and traditional finding only to the northern part of Unit 11 ... and not to areas further south in which the Board concluded that Unit 12 residents had not established a customary

---

[30]Id. at page 2151.

[31]Id.

[32]Id. at page 2154.

[33]Id. at page 2155.

[34]Id.

and traditional pattern of use."[35]  After some discussion about the areas of use, the FSB voted to adopt the proposal.[36]

The final rule incorporating the proposal was published on June 22, 2005.  On August 18, 2005, plaintiff requested reconsideration.  Plaintiff's request for reconsideration was based on its contention that the evidence before the FSB did not show that Chistochina residents had customarily and traditionally harvested moose throughout most of GMU 12.  Plaintiff described what it believed to be the actual area of use supported by the evidence as:

> The portion of Game Management Unit 12 that includes the drainage of the Nabesna River upstream from the mouth of Lick Creek, and the area south of and including the Pickerel Lake Winter Trail from Lick Creek to the Chisana River.[[37]]

At an executive session of the FSB on January 9, 2006, the FSB voted to deny plaintiff's request for reconsideration.[38]  On May 9, 2006, plaintiff filed the instant action.

Plaintiff's complaint alleges two counts, both of which are based on plaintiff's contention that the moose C&T determination for Chistochina residents must be set aside because the evidence

---

[35]Id.

[36]Id. at page 2161.

[37]Request for Reconsideration of Federal Subsistence Board Proposal WP05-21, Admin. Rec. at Tab 41, page 2513.  This area encompasses some 2,500 square miles.

[38]Admin. Rec. at Tab 48, page 2659.

-13-

shows that Chistochina residents only hunted moose in a small portion of GMU 12.[39] In Count I, plaintiff alleges that defendants violated ANILCA because the C&T determination 1) "provide[s] a subsistence preference for uses that are not 'subsistence uses'" as defined in ANILCA, 2) was adopted in violation of the requirement that federal agencies cooperate with adjacent landowners and land managers;[40] and 3) was "adopted in violation of the mandate ... to limit restrictions on nonsubsistence uses to those restrictions that are necessary."[41]  In Count II, plaintiff alleges that defendants violated the Administrative Procedure Act.  Specifi-cally, plaintiff alleges that defendants' conduct was arbitrary and capricious because 1) the regulation provides a subsistence preference for uses that are not "subsistence uses", 2) there was no rational basis for the C&T determination, 3) the FSB deferred to the recommendations of the RAC without considering whether the recommendations were supported by substantial evidence, and 4) the FSB failed to apply the eight C&T regulatory factors.[42]  Plaintiff also alleges that defendants exceeded their statutory authority

---

[39]It is undisputed that the evidence shows actual harvest of moose by Chistochina residents in only a small portion of GMU 12.

[40]The issue of whether the FSB violated section 802 of ANILCA, 16 U.S.C. § 3112, was not briefed by plaintiff and is deemed abandoned as to both plaintiff's Counts I and II.

[41]Complaint for Declaratory and Injunctive Relief at 15, ¶ 62, Docket No. 1.

[42]Id. at 16-17, ¶ 64.

because 1) the regulation provides a subsistence preference for uses that are not "subsistence uses", 2) the FSB improperly expanded its jurisdiction; 3) the FSB failed to cooperate with adjacent landowners in managing subsistence activities on public lands, and 4) the regulation resulted in unnecessary restrictions on nonsubsistence uses.[43]  Plaintiff seeks the following relief:

> 1) an order declaring the C&T determination unlawful;
>
> 2) an order setting aside the portion of the June 22, 2005 final rule dealing with the moose C&T determination for Chistochina;
>
> 3) an injunction prohibiting defendants from applying the C&T determination at issue here; and
>
> 4) an injunction prohibiting defendants from making further C&T determinations "for geographic areas outside the geographic boundaries of areas where the board has established a rational basis for a customary and traditional use determination under 50 C.F.R. § 100.16 and 36 C.F.R. § 242.16 where the State does not concur with such expansion[.][44]

The issues raised in plaintiff's complaint have been brought before the court via plaintiff's motion for summary judgment, in which plaintiff argues that the court should invalidate the moose

---

[43]Id.

[44]Id. at 17-18.

C&T determination for Chistochina.  In response, defendants argue that plaintiff's complaint should be dismissed because plaintiff lacks standing, or in the alternative, if plaintiff has standing, that the moose C&T determination for Chistochina survives review.  These issues have been fully briefed and are now ready for disposition.

Standing

As an initial matter, the court must address whether plaintiff has standing to bring its claims.  "The standing inquiry involves both Article III limitations and non-constitutional statutory limitations."  <u>City of Sausalito v. O'Neill</u>, 386 F.3d 1186, 1197 (9th Cir. 2004).  "The 'irreducible constitutional minimum of standing contains three elements': (1) injury in fact; (2) causation; and (3) likelihood that a favorable decision will redress the injury."  <u>Schneider v. Chertoff</u>, 450 F.3d 944, 959 (9th Cir. 2006) (quoting <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992)).  The dispute here centers on whether plaintiff can show an injury in fact.  If plaintiff can show an injury in fact, there is no dispute that it can meet the causation and redressability requirements for constitutional standing.

In order to show an injury in fact, a plaintiff must demon-strate that it suffered "'an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.'"  <u>Scott v. Pasadena</u>

-16-

Unified School Dist., 306 F.3d 646, 654 (9th Cir. 2002) (quoting Lujan, 504 U.S. at 560). The burden of establishing standing is on plaintiff. Id. at 655. At this stage of the litigation, plaintiff "'must set forth by affidavit or other evidence specific facts, showing that [it has] suffered an injury in fact that is fairly traceable to the action [it] seek[s] to challenge.'" Smelt v. County of Orange, 447 F.3d 673, 678 (9th Cir. 2006) (quoting Arakaki v. Hawaii, 314 F.3d 1091, 1098 (9th Cir. 2002)).

Contrary to defendants' contentions, plaintiff is not seeking to protect the interests of third parties (non-federal subsistence users and nonsubsistence users) nor is plaintiff seeking to bring a parens patriae suit against the United States. Rather, plaintiff is seeking to protect its sovereign interest in the enforcement of its civil and criminal codes and its sovereign and proprietary interests in wildlife management. Plaintiff contends that defendants' action has interfered with these interests. Injury to a state's sovereign interests is sufficient to establish an "injury in fact." See California v. F.C.C., 75 F.3d 1350, 1361 (9th Cir. 1996) (citing Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592, 601-602 (1982)). Plaintiff contends that its sovereign interests have been injured because the C&T determination in question gives Chistochina residents the right to hunt at times when hunting is otherwise prohibited under state law and to take moose whose harvest is prohibited under state law. Plaintiff

contends that this makes management of the moose population and enforcement of state hunting regulations in GMU 12 more difficult. Thus, plaintiff contends that defendants' conduct has interfered with the State's sovereign and proprietary interests in wildlife management and enforcement of state laws. Plaintiff also contends that further injury may result because more moose can now be taken in GMU 12, which will cause plaintiff to impose more stringent restrictions on other users.

To support its injury in fact contentions, plaintiff offers the affidavits of Matthew H. Robus, Director of the Division of Wildlife Conservation for the Alaska Department of Fish and Game; and Lt. Gary Folger, the Northern Region Commander in the Alaska Bureau of Wildlife Enforcement for the Alaska State Troopers. Robus avers that a C&T determination, even if it is only for a few people, makes wildlife management more difficult for the State "because the same wildlife populations are subject to harvest under two different sets of rules, one federal and one state, often with different harvest areas, harvest limits, size limitations, sex limitations, and reporting requirements."[45] Robus also avers that a C&T determination, even if it is only for a few people, makes enforcement more difficult because it can be difficult to determine if a taking was done on public lands and/or by someone entitled to

[45]Affidavit of Matthew H. Robus at 3, ¶ 7, Exhibit C, Plaintiff's Reply to Defendants' Brief Responding to Plaintiff's Motion for Summary Judgment, Docket No. 40.

legally take an animal under federal law.[46]  Robus expressly avers
that "[t]he expansion of Chistochina's federal C&T determination to
include all of Unit 12, instead of a small portion of the Unit, has
increased the workload of my staff and made management more
difficult."[47]    Robus further avers that "State moose hunting
regulations, adopted by the Board of Game for Unit 12 have become
more restrictive since the adoption of the Federal Subsistence
Board's C&T determination for Chistochina residents in Unit 12."[48]
Attached to his affidavit are supporting documents which illustrate
that some additional restrictions have been placed on hunting moose
in GMU 12 for the 2006-2007 State hunting season.  Folger avers
that "[t]he expansion of Chistochina's customary and traditional
use determination to include all of Unit 12, instead of a small
portion of the Unit, has increased the workload of state enforce-
ment officers and made enforcement in any given area more difficult
and less likely to occur."[49]  Folger avers that "[w]here a federal
hunting season opens before the state hunting season or extends
beyond a state hunting season as it does in Unit 12, Alaska Bureau
of Wildlife Enforcement officers are often required to spend

---

[46]Id. at 4, ¶ 9.

[47]Id. at 8, ¶ 21.

[48]Id. at ¶ 22.

[49]Affidavit of Lt. Gary Folger at 4, ¶ 13, Exhibit D, Plain-
tiff's Reply to Defendants' Briefs Responding to Plaintiff's Motion
for Summary Judgment, Docket No. 40.

additional time in the field and often receive complaints where hunters are observed hunting during closed state seasons."[50] Folger further avers that "[e]very increase in the number of federally qualified users, whether made through granting additional positive customary and traditional use determinations or expanding the area of existing determinations, makes it more difficult to enforce Alaska's wildlife regulations, even small increases have cumulative effects."[51]

These affidavits contain sufficient facts to establish that plaintiff has suffered an injury in fact. The fact that the State has had to restrict the state harvest of moose in one area of GMU 12 is sufficient to show an actual, concrete injury. Because plaintiff has shown an injury in fact, and causation and redressability are not disputed, the court concludes that plaintiff has Article III standing.

"It is not enough, however, for a plaintiff to satisfy the constitutional standing requirements of Article III." City of Sausalito, 386 F.3d at 1199. "A plaintiff must also satisfy the non-constitutional standing requirements of the statute under which he or she seeks to bring suit." Id. "[T]he nonconstitutional standing inquiry is whether a particular plaintiff has been granted a right to sue by the statute under which he or she brings suit."

---

[50]Id. at 5, ¶ 15.

[51]Id. at ¶ 16.

Id.  Plaintiff has brought suit under both Title VIII of ANILCA and the APA.

The judicial enforcement provision of Title VIII provides in pertinent part:

> Local residents and other persons and organi-
> zations aggrieved by a failure of ...  the
> Federal Government to provide for the priority
> for subsistence uses set forth in section 3114
> of this title ... may, upon exhaustion of any
> State or Federal (as appropriate) administra-
> tive remedies which may be available, file a
> civil action in the United States District
> Court for the District of Alaska to require
> such actions to be taken as are necessary to
> provide for the priority.

16 U.S.C. § 3117(a).  Plaintiff is not alleging that it has been aggrieved by the failure of defendants to provide for a subsistence priority; it is alleging that is has been aggrieved because defendants provided a subsistence priority for the residents of Chistochina for moose in GMU 12.  Plaintiff thus does not have prudential standing under ANILCA, which means that Count I of plaintiff's complaint shall be dismissed on standing grounds.

To have prudential standing under the APA, "a plaintiff 'must establish (1) that there has been a final agency action adversely affecting [it], and (2) that, as a result, it suffers legal wrong or that its injury falls within the "zone of interests" of the statutory provision the plaintiff claims was violated.'"  Nuclear Info. and Resource Serv. v. Nuclear Regulatory Comm'n, 457 F.3d 941, 950 (9th Cir. 2006) (quoting Churchill County v. Bennett, 150

F.3d 1072, 1078 (9th Cir. 1998)). Plaintiff contends that its injury falls within the "zone of interests" of ANILCA.

Although Title VIII's primary purpose relates to subsistence uses of fish and wildlife on public lands, that is not the only purpose. Congress found that there was a national interest in the regulation, protection, and conservation of fish and wildlife populations in Alaska. 16 U.S.C. § 3111(5). The injury that plaintiff alleges here, interference with its ability to manage wildlife and enforce state hunting regulations, falls within this zone of interest. In fact, ANILCA recognizes that states, rather than the federal government, generally are entitled to manage wildlife within their boundaries. See 16 U.S.C. § 3202(a) ("Nothing in this Act is intended to enlarge or diminish the responsibility and authority of the State of Alaska for management of fish and wildlife on the public lands except as may be provided in subchapter II of this chapter...."[52]). Because plaintiff's injury falls within the zone of interests of ANILCA, plaintiff has prudential standing under the APA.

Because plaintiff has Article III standing and prudential standing to bring an APA claim, the court has jurisdiction to consider the merits of Count II of plaintiff's complaint, which calls upon the court to review agency action.

---

[52]ANILCA is codified as chapter 51 of title 16 of the United States Code. Title VIII of ANILCA has been codified as subchapter II of chapter 51.

<u>Standard of Review</u>

Review of agency action is governed by Section 706(2) of the APA. Pursuant to the APA, "[a] decision of an administrative agency 'must be set aside if the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or if the action failed to meet statutory, procedural, or constitutional requirements.'" <u>Nevada Land Action Ass'n v. U.S. Forest Service</u>, 8 F.3d 713, 716 (9th Cir. 1993) (quoting <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 414 (1971) (quoting 5 U.S.C. § 706(2)). Plaintiff contends that the promulgation of the moose C&T determination for Chistochina residents was arbitrary and capricious and not in accordance with law. "In determining whether an action is arbitrary or capricious, we consider 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" <u>Id.</u> at 716-17 (quoting <u>Citizens to Preserve Overton Park</u>, 401 U.S. at 416). "In determining whether [an agency] has acted in accordance with law, [the court] defer[s] to [the agency's] reasonable interpretations of its governing statutes." <u>Golden Northwest Alum., Inc. v. Bonneville Power Admin.</u>, --- F.3d ---, 2007 WL 1289539, at *5 (9th Cir. May 3, 2007).

<u>Statutory definition of "subsistence uses"</u>

Plaintiff argues that defendants have failed to act in accordance with law because the C&T determination for moose for

-23-

Chistochina residents for all of GMU 12 is inconsistent with the definition of "subsistence uses" in ANILCA.  "Subsistence uses" are defined as

>           the <u>customary and traditional uses</u> by rural
> Alaska residents of wild, renewable resources
> for direct personal or family consumption as
> food, shelter, fuel, clothing, tools, or
> transportation; for the making and selling of
> handicraft articles out of nonedible byprod-
> ucts of fish and wildlife resources taken for
> personal or family consumption; for barter, or
> sharing for personal or family consumption;
> and for customary trade.

16 U.S.C. § 3113 (emphasis added).  Plaintiff interprets this statutory definition to mean that in order to qualify as a "subsistence use", a <u>taking</u> must be customary and traditional. Plaintiff insists that when the definition of "subsistence uses" is read with section 804 of ANILCA, it is clear that the subsistence priority is conditioned on the <u>taking</u> of fish and wildlife being customary and traditional.  Section 804 of ANILCA provides that "the taking on public lands of fish and wildlife for nonwasteful subsistence uses shall be accorded priority over the taking on such lands of fish and wildlife for other purposes."  16 U.S.C. § 3114. Because, according to plaintiff, the taking must be customary and traditional, plaintiff argues that the taking must be defined in terms of a specific species and a specific area.

Defendants argue that "customary and traditional" as used in the definition of "subsistence uses" refers to how the resources are used by individuals <u>after</u> they are taken and is not a condition

-24-

precedent for the taking of a specific resources.  In other words, defendants argue that the subsistence priority is not conditioned on the <u>taking</u> of fish and wildlife being customary and traditional, but rather it is conditioned on the <u>use</u> of the fish and wildlife being customary and traditional.  Thus, under defendants' interpretation of "subsistence uses", the use of a particular species does not have to be tied to a specific area in order to be "a customary and traditional use."  All that is required is a showing that a community, such as Chistochina, has customarily and traditionally consumed a resource, such as moose.  Defendants contend that their interpretation is supported by section 804 of ANILCA because nothing in section 804 requires that the taking be tied to a specific harvest area or species.  Rather, according to defendants, section 804 provides that the subsistence priority applies generally to all fish and wildlife, as long as the fish and wildlife are used for subsistence purposes.

"When reviewing an agency's interpretation of a statute it is charged with administering, [the court] look[s] first 'to the statutory text to see whether Congress has spoken directly to the question at hand.'"  <u>Arizona State Bd. for Charter Schools v. U.S. Dep't of Educ.</u>, 464 F.3d 1003, 1006 (9th Cir. 2006) (quoting <u>Contract Mgmt., Inc. v. Rumsfeld</u>, 434 F.3d 1145, 1146-47(9th Cir. 2006)).  "'If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect

to the unambiguously expressed intent of Congress.'" Id.  "[I]f
the statute is uncertain or ambiguous, ... [the court] defer[s] to
the agency's interpretation if it is based on 'a permissible
construction of the statute.'"  Id. (quoting United States v.
Lopez-Perera, 438 F.3d 932, 935 (9th Cir. 2006)).

     ANILCA does not define "customary and traditional."  Plaintiff
emphasizes that ANILCA repeatedly makes reference to the continua-
tion of subsistence uses, but none of these references say anything
about subsistence uses being tied to a specific geographical area
or that subsistence uses must be based upon a customary and
traditional taking.  The legislative history reveals that

> the phrase "customary and traditional" is
> intended to place particular emphasis on the
> protection and continuation of the taking of
> fish, wildlife and other renewable resources
> in areas of, and by persons (both Native and
> non-Native) resident in, areas of Alaska in
> which such uses have played a long established
> and important role in the economy and culture
> of the community and in which such uses incor-
> porate beliefs and customs which have been
> handed down by word of mouth or example from
> generation to generation.

Senate Report No. 96-413, at 269 (1979) as reprinted in 1980
U.S.C.C.A.N. 5070, 5213.  This piece of legislative history does
make reference to a "taking" in connection with "customary and
traditional."  But it says nothing about whether a "customary and
traditional" use or taking has to be defined in a specific
geographical area in order to be a "subsistence use".  The
reference in the passage about "area" appears to have reference to

-26-

the urban/rural distinction in Title VIII and not to the "area" in
which a resource is customarily and traditionally taken.

Defendants' interpretation of "customary and traditional" as
used in the statutory definition of "subsistence uses" is not
entitled to the deference it might otherwise deserve since it
appears to have been first advanced in a litigation brief. See
Hertzberg v. Dignity Partners, Inc., 191 F.3d 1076, 1082 (9th Cir.
1999). Nevertheless, defendants have the better of this disagree-
ment. As regards the interplay between subsistence uses and the
taking of fish and wildlife, defendants' interpretation of the law
is a plausible interpretation, whereas plaintiff's is not. In the
definition of "subsistence uses", the words "customary and
traditional" modify the word "uses" -- not the word "takings". It
is the customary and traditional use of a fish or wildlife resource
that makes it a subsistence use. The language in the definition is
plain. Plaintiff's contention would impermissibly substitute or
interchange the word "takings" for the words "uses." Section 803
and 804 may lack detail, but are not ambiguous vis-a-vis plain-
tiff's argument. Moreover, Sections 803 and 804 contain no express
geographical (area) component as to the customary and traditional
taking of fish and wildlife for subsistence uses. Section 804
provides a priority for the taking of fish and wildlife for
subsistence uses, which, according to the statutory definition,
involves the customary and traditional uses of resources.

Plaintiff's argument that there is a statutory nexus between "customary and traditional" and "taking" fails; but even if such a nexus existed, plaintiff has pointed to nothing that supports its contention that a "customary and traditional taking" must be tied to a specific area.   Thus, the moose C&T determination for Chistochina residents is not inconsistent with the statutory definition of "subsistence uses" because of a lack of nexus between Chistochina residents' use of moose and the FSB's determination to extend Chistochina residents' moose hunting area to the entirety of GMU 12.   In order to be a subsistence use for purposes of Title VIII, the "use" must have been customary and traditional.   The evidence in the record establishes that Chistochina residents have customarily and traditionally used moose for subsistence.

The foregoing should not be taken to mean that the court has endorsed without qualification defendants' contention that Section 804 provides that the subsistence priority applies generally to all fish and wildlife, as long as the fish and wildlife are used for subsistence purposes.   This position seems to imply that there are no geographical limits to any customary and traditional uses of fish and wildlife determined by the FSB.   The court is not prepared to go that far, and the needs of this case require no such expansive interpretation of Section 804.   Here, the FSB made a determination with respect to the geographical extent of its moose determination for Chistochina residents, and the court will

evaluate that determination under the standards set forth in Section 706(2) of the APA.

<u>Regulatory definition of "customary and traditional"</u>

Plaintiff next argues that defendants have failed to act in accordance with law because the moose C&T determination for Chistochina residents for all of GMU 12 is inconsistent with the regulatory definition of "customary and traditional use."[53]   For purposes of the subsistence management regulations, "customary and traditional use" is defined as

> a long-established, consistent pattern of use, incorporating beliefs and customs which have been transmitted from generation to genera- tion.  This use plays an important role in the economy of the community.

50 C.F.R. § 100.4.

Plaintiff argues that the moose C&T determination is inconsis- tent with the regulatory definition of "customary and traditional use" because there was no evidence of any use by Chistochina residents for the majority of GMU 12, much less a "long established consistent pattern of use."  Plaintiff contends that whenever the regulations require a "pattern of use" showing, they are referring to a pattern of use for a specific area or a specific stock or population.  Plaintiff argues that this interpretation of "pattern

_____

[53]Plaintiff is not arguing that the regulatory definition of "customary and traditional use" is inconsistent with how that term is used in the statutory definition of "subsistence uses." Plaintiff believes that both the regulatory and the statutory definitions at issue here encompass a geographical requirement.

-29-

of use" follows from the requirement in 50 C.F.R. § 100.16(a) that the FSB, in making customary and traditional use determinations "identify the specific community's or area's use of specific fish stocks and wildlife populations." What plaintiff seems to be suggesting is that a "specific" fish stock or wildlife population must refer to a specific fish stock or wildlife population in a specific geographical area.

The court "'will generally afford deference to the agency's construction of its own regulation[.]'" Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 481 F.3d 1224, 1237 (9th Cir. 2007)(quoting Regents of Univ. of Cal. v. Shalala, 82 F.3d 291, 294 (9th Cir. 1996)). However, the court will not uphold an interpretation of a regulation that is plainly erroneous or inconsistent with the regulation. Id. Where, as here, there is no administrative interpretation of the regulation, the court must impose its own construction of the regulation. See Mesa Verde Const. Co. v. N. Cal. Dist. Council of Laborers, 861 F.2d 1124, 1131 n.5 (9th Cir. 1988) (citing Chevron U.S.A. v. Natural Resources Def. Council, Inc., 467 U.S. 837 (1984)).

Plaintiff is reading words into a definition that are simply not there. There is nothing in section 100.16(a) that suggests that the phrase "pattern of use" must be tied to a specific geographical area. The Secretaries directed the FSB to "determine which fish stocks and wildlife populations have been customarily

and traditionally used for subsistence." 50 C.F.R. § 100.16(a). The customary and traditional use determinations that the FSB makes must be based on a specific community's use of a specific fish stock or wildlife population. Id. But, nothing in section 100.16(a) states that a specific wildlife population has to be defined in terms of a specific geographical area.

The court has looked at common dictionary definitions of "pattern" to see if there is any support for plaintiff's interpretation. Of the many definitions of "pattern", the one that seems to fit here is "frequent or widespread incidence."[54] But even this definition does not contain a "where" component. There does not seem to be anything about the plain meaning of the word "pattern" that suggests that the "use" must be in a specific geographical area. Plaintiff has cited to nothing that supports its interpretation of "pattern of use" as used in the definition of "customary and traditional use." The court concludes that the moose C&T determination for Chistochina residents is not inconsistent with the regulatory definition of "customary and traditional use". There is simply nothing about that definition that suggests that the customary and traditional use must be tied to a specific area.

<u>The "where" component</u>

The FSB has, in practice, imposed a "where" component in making C&T determinations. It has done so in this case, and

---

[54]<u>Merriam-Webster's</u> Online Dictionary, **http://www.m-w.com/**.

plaintiff contends that the area designated--all of GMU 12--is arbitrary and capricious.

When the subsistence management regulations were first promulgated, the Secretaries acknowledged that the "Federal process for customary and traditional use determinations will consider the customary and traditional use of each wildlife population or fish stock within a given area by the residents of that area." 57 Fed. Reg. 22940, 22948 (May 29, 1992). The FSB has at times defined the "given area" as a whole GMU and at others as something less than an entire GMU.[55] Defendants contend that neither ANILCA nor the implementing regulations require the FSB to ignore the existing boundaries of game management units (which were established by plaintiff to begin with) and to draw sub-boundaries within a GMU to reflect areas of actual use of a specific resource when making C&T determinations. Plaintiff suggests that the eight regulatory C&T factors require the FSB to limit a C&T determination to areas of actual use.

As set out above, in making a C&T determination for a specific community, the FSB must consider whether the community "generally exhibit[s]" the eight regulatory factors, "which exemplify

---

[55]Admin. Rec. at Tab 34, page 1680 (The FSB "has a varying practice in which some customary and traditional use determinations are for whole units, while some are attributed to sub-units, or portions of units.").

customary and traditional use." 50 C.F.R. § 100.16(b). The eight
C&T factors are:

> (1) A long-term consistent pattern of use,
> excluding interruptions beyond the control of
> the community or area;
> (2) A pattern of use recurring in specific
> seasons for many years;
> (3) A pattern of use consisting of methods and
> means of harvest which are characterized by
> efficiency and economy of effort and cost,
> conditioned by local characteristics;
> (4) The consistent harvest and use of fish or
> wildlife as related to past methods and means
> of taking; near, or reasonably accessible
> from, the community or area;
> (5) A means of handling, preparing, preserv-
> ing, and storing fish or wildlife which has
> been traditionally used by past generations,
> including consideration of alteration of past
> practices due to recent technological ad-
> vances, where appropriate;
> (6) A pattern of use which includes the hand-
> ing down of knowledge of fishing and hunting
> skills, values, and lore from generation to generation;
> (7) A pattern of use in which the harvest is
> shared or distributed within a definable
> community of persons; and
> (8) A pattern of use which relates to reliance
> upon a wide diversity of fish and wildlife
> resources of the area and which provides
> substantial cultural, economic, social, and
> nutritional elements to the community or area.

Id.

Much of plaintiff's argument here is based on its contention
that "pattern of use" must be interpreted as having a geographical
component. Thus, in plaintiff's view, factors (1)-(3) and (6)-(8),
because they refer to "pattern of use", require the FSB to limit a
C&T determination to a specific geographical area for which there
is evidence of actual use. But, plaintiff's definition of "pattern

-33-

of use" is not plausible, and plaintiff's argument that the most of the eight regulatory factors impose a "where" component is inconsistent with the plain meaning of factors (1)-(3) and (5)-(8).

The only factor that expressly addresses the "where" component is factor four. Factor four requires that the use in question be "near, or reasonably accessible from, the community or area".[56] Thus, in making a C&T determination for a specific community, the FSB must consider whether the community in question has consistently harvested the species in question in an area that is either close to the community or is reasonably accessible to that community.

The regulation provides that the FSB must consider whether a community "generally exhibits" the eight C&T factors. The use of the word "generally" indicates that the FSB has some discretion in deciding whether the eight regulatory factors (including factor four) are met. Inherent in that general discretion is the specific discretion to determine the geographical extent of the area relevant to the use of a specific fish stock or wildlife population. In short, there is no rigid regulatory requirement that a C&T determination can be made only for an area for which actual use had been demonstrated. The FSB has the discretion to make a C&T

_____

[56]Neither "near" nor "reasonably accessible" are defined by regulation.

-34-

determination for an entire GMU, even if a community has only shown actual use in a portion of the GMU.

The discretion of the FSB as regards geographical extent of its C&T determinations is not unlimited.  The court must still review the agency's line-drawing to see if it is arbitrary and capricious.  See Yakutat, Inc. v. Gutierrez, 407 F.3d 1054, 1072-73 (9th Cir. 2005).

### Arbitrary and capricious

Plaintiff argues generally that the agency's line-drawing in this instance was arbitrary and capricious because the FSB did not engage in any discussion of the eight C&T factors, except for factor four, during its meeting and thus cannot be deemed to have "considered" the regulatory C&T factors.  The FSB is certainly required to consider the eight C&T factors, but that does not mean that the FSB must engage in an oral discussion as to each factor. The meeting record contains a written discussion of the eight C&T factors, that presumably the FSB members had read and considered in preparation for the meeting.  The fact that there was not an oral discussion of each factor does not mean that the FSB did not consider the C&T factors as required by regulation.

With respect to factor four and the FSB determination in question, plaintiff contends that it was arbitrary and capricious for the FSB to decline to divide GMU 12 into subunits for the purpose of amending the moose C&T determination for Chistochina

-35-

residents.    Plaintiff  argues  that  defendants  have,  in  essence,
conceded  that  the  moose  C&T  determination  does  not  meet  factor  four
because  defendants  have  admitted  that  the  distant  portions  of  GMU
12  are  not  "readily  accessible"  from  Chistochina.

Defendants  aptly  point  out  and  the  record  confirms  the
following.  First, C&T determinations apply only as to federal, not
state, public lands, and nearly half (41%) of GMU 12 is not <u>federal</u>
public  land.   Second,  much  of  the  federal  public  land  in  GMU  12  is
remote  and  not  readily  accessible  and  is  unlikely  to  be  used
extensively  by  the  residents  of  Chistochina  and  thus  there  was  no
practical  need  to  exclude  these  areas.

Defendants  also  suggest  that  the  moose  population  in  GMU  12
has  been  in  decline  since  the  1970s  and  it  would  be  unfair  and
contrary  to  the  purposes  of  ANILCA  to  penalize  the  residents  of
Chistochina  for  this  decline.   However,  this  moose  population
decline  argument  appears  to  be  a  post  hoc  rationalization,  a
rationalization  not  needed  here.   In  the  Staff  Committee  report,  a
logical  reason  was  given  for  not  further  dividing  GMU  12  for
purposes  of  the  Chistochina  moose  C&T  determination.   The  Inter-
agency  Staff  Committee  supported  the  C&T  determination  proposal
even  though  it  acknowledged  that  actual  use  was  only  shown  for  a
portion  of  GMU  12  because  "no  additional  benefit  to  management
occurs  from  creating  new  portions  of  a  unit  for  customary  and

traditional findings in Unit 12."[57]  This is a rational and logical reason for the FSB to decide not to divide a GMU into sub-units for purposes of a C&T determination.   While it might have been technically preferable for the FSB to exclude inaccessible and/or state land, an agency action is not arbitrary and capricious if the agency has "'considered the relevant factors and articulated a rational connection between the facts found and the choices made." Nw. Ecosystem Alliance v. U.S. Fish and Wildlife Serv., 475 F.3d 1136, 1140 (9th Cir. 2007) (quoting Nat'l Ass'n of Home Builders v. Norton, 340 F.3d 835, 841 (9th Cir. 2003)).  Failing to expressly exclude areas in which the FSB determination in question has no practical application is neither arbitrary or capricious.

     Plaintiff argues that it was arbitrary and capricious for the FSB to rely on the statement about management benefit because it was an "outside" factor, i.e., not one of the eight C&T regulatory factors.  Agency action can be considered arbitrary and capricious "'if the agency has relied on factors which Congress has not intended it to consider[.]'"  Nw. Envtl Def. Ctr. v. Bonneville Power Admin., 477 F.3d 668, 687 (9th Cir. 2007) (quoting Motor Vehicle Mfgs. Ass'n v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 43 (1983)).  Game management policy is not  an "outside" factor.  It is properly encompassed in the agency's consideration of factor four and thus was properly relied on by the FSB in

---

[57]Admin. Rec. at Tab 35, page 2154.

deciding not to divide GMU 12 for purposes of this C&T determina-
tion. Moreover, what the FSB considered here is consistent with
and required by section 802(1) and (2), statutory policies of
Congress. 16 U.S.C. § 3112(1) and (2). In sum, with respect to the
factor four, and the C&T determination in question, plaintiff has
not demonstrated that the FSB's line-drawing was clearly erroneous
or arbitrary and capricious.

Plaintiff also argues that defendants' promulgation of the C&T
determination was arbitrary and capricious because it was not
supported by substantial evidence. There is no requirement that
the FSB's decision be supported by substantial evidence. The
"substantial evidence" standard of review "applies only when the
agency decision involves a rulemaking procedure under 5 U.S.C. §
553 or is based on a 'public adjudicatory hearing.'" Nevada Land
Action Ass'n, 8 F.3d at 717 n.3 (quoting Citizens to Preserve
Overton Park, 401 U.S. at 414). This was not a rulemaking under 5
U.S.C. § 553 nor was the C&T determination based on a public
adjudicatory hearing. Furthermore, plaintiff's substantial
evidence argument is based on its contention that there must be
evidence of actual use in an entire GMU before a positive C&T
determination can be made. If this contention fails, which it
does, plaintiff's substantial evidence argument also fails.

Plaintiff also contends that the FSB improperly relied on the
RAC recommendations in favor of the C&T determination because the

-38-

RAC recommendations were not supported by substantial evidence. ANILCA requires that the Secretaries "consider" recommendations from the RACs. 16 U.S.C. § 3115(c). The Secretaries "may choose not to follow any [RAC] recommendation which he determines is not supported by substantial evidence, violates recognized principles of fish and wildlife conservation, or would be detrimental to the satisfaction of subsistence needs."[58] Id. Plaintiff insists that reading these two provisions together makes it clear that Congress imposed a mandatory duty upon the Secretaries to consider RAC recommendations and then included some standards that would guide that consideration, and those standards include a "substantial evidence" standard. Plaintiff also points out that the regulations provide that RAC recommendations "should be supported by substantial evidence[.]" 50 C.F.R. § 100.11(c)(3). The statute and the regulations allow the Secretaries or the FSB to reject a RAC recommendation if it is not supported by substantial evidence, but they do not provide that a RAC recommendation must be supported by substantial evidence in order for the Secretaries or the FSB to make a determination consistent with a RAC recommendation. The regulations do provide that a RAC recommendation should be

---

[58]In delegating their authority by regulation to the FSB, the Secretaries placed the same requirements on the FSB. The FSB must "consider" RAC recommendations and "may choose not to follow any Regional Council recommendation which it determines is not supported by substantial evidence...." 50 C.F.R. § 100.10(e).

supported by substantial evidence, but they do not provide that a
RAC recommendation <u>must</u> be supported by substantial evidence.

The court concludes that the FSB considered the relevant
factors and that there is a rational basis for its decision to not
divide GMU 12 into sub-units for purposes of the moose C&T
determination for Chistochina residents.  Thus, the moose C&T
determination is not arbitrary and capricious.

<u>Section 815</u>

Finally, plaintiff argues the moose C&T determination for
Chistochina residents is not in accordance with law because it is
inconsistent with section 815 of ANILCA.  Section 815 provides:

> Nothing in this subchapter shall be construed
> as--
>
> ...authorizing a restriction on the taking of
> fish and wildlife for nonsubsistence uses on
> the public lands (other than national parks
> and park monuments) unless necessary for the
> conservation of healthy populations of fish
> and wildlife, for the reasons set forth in
> section 3126 of this title, to continue sub-
> sistence uses of such populations, or pursuant
> to other applicable law[.]

16 U.S.C. § 3125(3).  Plaintiff insists that the moose C&T
determination is unnecessary as it covered areas of GMU 12 for
which there was no evidence of use by Chistochina residents and
this unnecessary decision has led to or will lead to restrictions
on nonsubsistence uses of moose in GMU 12.  This argument fails
because the moose C&T determination is not a conservation rule and

-40-

C&T determinations do not per se limit non-subsistence hunting on public lands.

## Conclusion

Plaintiff's motion for summary judgment is denied. It follows that the decision of the FSB to adopt a rule expanding the C&T determination for moose for the community of Chistochina to include all of GMU 12 is affirmed. Plaintiff's complaint is dismissed with prejudice.

DATED at Anchorage, Alaska, this   27th   day of June, 2007.

/s/ H. Russel Holland
United States District Judge

-41-